**K–CON BUILDING SYSTEMS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 05–981C**

United States Court of Federal Claims.

(Filed: November 30, 2012)

William A. Scott, Charleston, SC, for plaintiff.

Daniel B. Volk, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

SWEENEY , Judge

Plaintiff K–Con Building Systems, Inc. filed three suits in this court concerning its contracts with the United States Coast Guard ("Coast Guard") for the design and construction of prefabricated metal buildings in Elizabeth City, North Carolina, St. Petersburg, Florida, and Port Huron, Michigan. The three suits share many similarities, but there are meaningful differences that require the court to address each suit separately. The court previously ruled on plaintiff's motions for partial summary judgment in the Elizabeth City and Port Huron suits. In this case, which concerns the building in St. Petersburg, plaintiff moves for summary judgment on two issues: whether the liquidated damages rate specified in the contract constitutes an unenforceable penalty and whether remission of some liquidated damages is ap-

propriate. Defendant cross-moves for summary judgment, alleging that plaintiff is not entitled to the remission of any liquidated damages. Defendant also moves to dismiss the bulk of plaintiff's claims for lack of jurisdiction. For the reasons set forth below, the court grants in part and denies in part defendant's motion to dismiss, denies plaintiff's motion for partial summary judgment, and grants defendant's cross-motion for summary judgment.

## I. BACKGROUND

In April 2001, the United States General Services Administration ("GSA") awarded plaintiff a Federal Supply Schedule contract for Prefabricated Structures and Outdoor Smoking Shelters.[1] Pl.'s App. 1–90. Subsequently, in the summer of 2003, the Coast Guard solicited a proposal from plaintiff for the design and construction of a prefabricated structure to serve as a supply warehouse in St. Petersburg. *Id.* at 101, 103. The Coast Guard divided the warehouse project into three components: a base item and two options items. *Id.* at 103, 137. The base item was described as follows: "Provide all services and materials necessary to design and construct a Supply Warehouse with loading dock. Project shall include all site work, utilities and parking for the USCG Group St. Petersburg, Florida. All work shall be performed in accordance with Specification No. 07–M8124 and drawings 1 through 9." *Id.* at 103. The first option item was to "[p]rovide toilet and other facilities within the warehouse as shown in drawing A102." *Id.* The second option item was to "[p]rovide Operation and Maintenance Storage facility, telephone closet and other facilities within the warehouse as shown in drawing A103." *Id.* Drawings A102 and A103 were two of the nine drawings referred to in the base item description. Id. at 136; see also Def.'s App. 31–32 (containing drawing A103). The Coast Guard awarded the contract to plaintiff on

September 5, 2003. Pl.'s App. 92, 101. Due to funding issues, only the base item was awarded. Id. at 103, 322–23, 333. The contract completion date was July 26, 2004. *Id.* at 92, 101.

### A. Development of the Liquidated Damages Rate

Along with other standard contract clauses, plaintiff's contract with the Coast Guard contained a standard liquidated damages clause. *Id.* at 116, 124. The clause provided for liquidated damages in the amount of $564 for each day that plaintiff failed to complete the building beyond the contractually specified completion date. Id. At the time that the parties executed the contract, the Coast Guard was bound by subpart 11.5 of the Federal Acquisition Regulation ("FAR"), which described the general parameters for the use of liquidated damages clauses.[2] *See, e.g., id.* at 364, 369, 374, 382–83. However, it was not subject to any regulations specifying precisely how to determine an appropriate liquidated damages rate. *Id.* at 358. Further, the Coast Guard had no settled policies or procedures concerning the determination of liquidated damages rates. *Id.* at 364, 382–83. Rather, the contracting officer, Cathy Broussard, prior to the solicitation of proposals for the project, determined the appropriate rate using a methodology that the Coast Guard had utilized since at least 1997, the year she joined its contracting staff. *Id.* at 237–38, 363–64, 382–83.

First, Ms. Broussard found that because the Coast Guard would "incur additional costs if the contractor" did not complete the work by the contract deadline and because it would be impossible to ascertain "[t]he extent or exact amount of damages" resulting from the contractor's failure to meet the deadline, it was appropriate to include a liquidated damages clause in the contract. *Id.* at 237. She then concluded that the rate of liquidated damages should be based on the

---

1. The court derives the facts in this section from plaintiff's complaint ("Compl."), plaintiff's amended complaint ("Am.Compl."), the appendices filed with the parties' motions for summary judgment ("Pl.'s App." and "Def.'s App."); the supplemental appendix filed with plaintiff's subsequent briefs ("Pl.'s Supp'l App."); and the undisputed facts offered by the parties ("Pl.'s

PUFF," "Def.'s Resp. PPUFF," "Def.'s PFUF," and "Pl.'s Resp. DPFUF").

2. All citations to the FAR refer to the version in effect on the date that the Coast Guard placed its order with plaintiff.

"probable actual damages" that the Coast Guard would incur if the contractor breached the contract by failing to complete the work on time. *Id.* (citing FAR 11.502).

Next, Ms. Broussard identified the extra costs that the Coast Guard would incur upon such a breach, breaking them down into two categories: "Travel/Per Diem, Inspection & Miscellaneous Costs" and "Administrative Costs for Government Representatives." Id. at 237–38. The first category included travel costs for the project manager and a member of the contracting staff, costs for the time of a construction inspector, and miscellaneous costs such as telephone and mail costs. Id. at 237. Ms. Broussard arrived at a total of $11,550 per month for this first category. Id.

The second category encompassed costs for the extra time that would be spent on the project by the Coast Guard personnel involved in the contract's administration and performance, as measured by the hourly rates for their services. *Id.* at 238. Ms. Broussard indicated that these costs were "[b]ased on the guidelines listed" in the following Coast Guard instruction: Standard Rates, Commandant Instruction 7310.1F (Jan. 20, 1999) ("COMDTINST 7310.1F"). *Id.* According to its terms, the purpose of the instruction was to establish standard rates for use in computing reimbursable charges, *i.e.*, the cost of services provided to other government agencies and the private sector that were recoverable pursuant to reimbursable agreements. COMDTINST 7310.1F at 1. However, because "[t]he 'direct' portion of the standard rates include[d] both fixed and variable costs," the rates were "not [to] be used to calculate ... foreseeable costs related to contracting actions...." *Id.* at 2. Among the standard rates described in the instruction were those for personnel services. *Id.* at Enclosure (2).

Using the standard rates for personnel services contained in COMDTINST 7310.1F, Ms. Broussard calculated the annual cost for each Coast Guard employee and then multiplied those costs by a specified percentage that represented the amount of time the employee would spend on the project. Pl.'s App. 238. She estimated that the Construc-

tion Division chief, the Contracting Division chief, and the team leader would spend five percent of their time on the project, the project manager would spend thirty-three percent of his time on the project, and the contracting officer would spend ten percent of her time on the project. *Id.* These percentages were contained in the Coast Guard's preexisting template, and Ms. Broussard did not know their origin. *Id.* at 378–79, 382–83. Ultimately, by dividing each annual amount by twelve, Ms. Broussard calculated monthly costs of $583 each for the Construction Division and Contracting Division chiefs, $478 for the team leader, $2,755 for the project manager, and $957 for the contracting officer, arriving at a total monthly cost of $5,356 for the second category. *Id.* at 238.

As the final step of her process, Ms. Broussard divided the sum of the monthly costs for the two categories by thirty to calculate a daily liquidated damages rate of $564. *Id.* At no point did Ms. Broussard make a specific written determination concerning the impact that a liquidated damages clause would have on pricing, competition, and contract administration. *Id.* at 369, 382–83. Nor did she document any consideration of the importance of the time of delivery or timely performance when determining that a liquidated damages clause was necessary. *Id.* at 364, 382–83.

## B. Contract Performance

### 1. Contract Deadlines

The contract award triggered deadlines related to construction bonds, project schedules, project meetings, the commencement of work, and the initial design submission, none of which was met by the parties. First, plaintiff was required to submit its payment and performance bonds to the Coast Guard within ten days of contract award, *i.e.*, by September 15, 2003. *Id.* at 110. Plaintiff, however, did not acquire its bonds until October 6, 2003, and the Coast Guard did not approve the bonds until October 15, 2003. Def.'s App. 4–8.

Then, within fourteen days of contract award, *i.e.*, by September 19, 2003, plaintiff was required, pursuant to section F of the contract, to "commence work" on the project,

with a "practicable schedule" of work due within fifteen days thereafter, *i.e.*, by no later than October 6, 2003. Pl.'s App. 110. At the same time, according to the contract specifications, plaintiff was prohibited from "commencing work" before the Coast Guard convened a postaward kickoff meeting, which was to occur within fourteen to twenty-eight days after contract award, *i.e.*, between September 19 and October 3, 2003. *Id.* at 173. Despite these provisions, the Coast Guard did not convene a postaward kickoff meeting by October 3, 2003, and plaintiff did not begin performance by September 19, 2003, or submit a schedule of work by October 3, 2003.

Instead, the Coast Guard scheduled the postaward kickoff meeting for October 15, 2003. *Id.* at 260. However, it cancelled the meeting on October 9, 2003, with the intent to reschedule it for a later date. *Id.* On October 16, 2003, plaintiff requested from the Coast Guard a " 'limited' notice to proceed" with the design work to allow its engineers to enter the job site to do surveying, soil exploration, and utility location. *Id.* If such permission were granted, plaintiff claimed, it would "speed up both design and eventual construction." *Id.* This request apparently crossed paths with the Coast Guard's October 15, 2003 letter approving plaintiff's bonds and permitting plaintiff to "commence work at the job site . . . ." Def.'s App. 8; *accord* Pl.'s Supp'l App. 5. The Coast Guard ultimately rescheduled the postaward kickoff meeting for November 4, 2003. Pl.'s App. 260–61; Def.'s App. 9–11. After plaintiff commenced this litigation, Steve Allen, the Coast Guard's project manager, stated his belief that the Coast Guard bore some responsibility for the delayed meeting. Pl.'s App. 313, 328–29, 331–32. In support, he noted that plaintiff had received an extension for a delayed meeting during the Elizabeth City project and that the Coast Guard had granted extensions to other contractors for delayed meetings. *Id.*

The contract specifications set forth the goals of the postaward kickoff meeting, including a discussion of any issues raised by plaintiff's proposal and an explanation of the relevant policies and procedures. *Id.* at 173.

Accordingly, during the meeting, the participants discussed a variety of issues related to the design documents that plaintiff would provide to the Coast Guard. Def.'s App. 9–11; Pl.'s Supp'l App. 4. In addition, plaintiff informed the Coast Guard that its geotechnical firm had begun its site investigation, and that it had hired both an architect and a firm to produce the site work and civil work designs. Def.'s App. 11.

The contract specifications further specified that plaintiff was to present to the Coast Guard a preliminary design schedule during the postaward kickoff meeting. Pl.'s App. 173. The schedule was to reflect plaintiff's submission of the design in three phases (a "50% design," a "100% design," and a "final design"). *Id.* at 176. Although plaintiff was contractually required to present its design schedule at the November 4, 2003 meeting, it was also contractually required to submit its 50% design before that date: within forty-five days of contract award, *i.e.*, by October 20, 2003. *Id.*

Plaintiff did not submit a 50% design to the Coast Guard by the contract-specified deadline. In fact, in the first complete schedule it submitted to the Coast Guard on November 7, 2003, plaintiff indicated that it had begun working, to an unknown extent, on the 50% design on October 16, 2003–the day it likely received the Coast Guard's notice to proceed–and planned to submit it to the Coast Guard around November 14, 2003. Def.'s App. 2. In that same schedule, plaintiff indicated that it anticipated beginning construction on December 29, 2003, erecting the building beginning on March 22, 2004, and completing the project around May 27, 2004–two months before the contract completion date. *Id.* at 2–3; *see also id.* at 22 (indicating that, as of February 12, 2004, plaintiff anticipated completing the project by May 26, 2004).

## 2. Foundation Redesign

Plaintiff did not meet its self-imposed November 14, 2003 deadline for submitting the 50% design to the Coast Guard. In fact, by and beyond that date, it was still gathering data necessary to prepare the design. For example, on December 10, 2003, plaintiff submitted a request for information ("RFI") to

the Coast Guard regarding the foundation slab design. Pl.'s App. 459. The next day, responding to plaintiff's inquiry regarding whether there was any "special design loading ... required for [the] floor slab," the Coast Guard stated: "No 'special' loading other than noted below is required. Other than the forklift, no other heavy equipment is anticipated. See spec[ification] section 01158, para[graph] 1.9.2.4 'Mezzanines' for loading of future mezzanines. See ... drawing A102 for proposed layout of future mezzanines." Id. Plaintiff apparently submitted the 50% design shortly thereafter. In a January 6, 2004 letter, the Coast Guard noted several issues with the design that required plaintiff's attention before it could conduct its official review. Id. at 262. These issues included electronic files that did not comply with computer-aided-design requirements, incomplete drawing sets, systems missing from the drawings, and missing calculations for the foundation design. Id. In its comments concerning the last issue, the Coast Guard added: "[T]he future mezzanine loads must be accounted for in the foundation and slab design as noted in our response to your RFI #4 dated 12/10/03." Id. To address the Coast Guard's comments related to the mezzanine, plaintiff was required to have its designer redesign the foundation, which entailed making new calculations and amending its drawings. Id. at 338; Def.'s App. 19–21.

In a January 15, 2004 electronic-mail message, plaintiff explained to the Coast Guard its view that because the Coast Guard did not award the second contract option, it was not required to design the building to accommodate a mezzanine. Pl.'s App. 461. However, plaintiff indicated that it would proceed with the redesign, which would be completed by January 16, 2004, at no cost to the Coast Guard. Id.; Def.'s App. 20. Mr. Allen responded that "the structure/foundation still must support a future mezzanine," indicated that the Coast Guard's comments regarding the mezzanine did not constitute a change to the contract, and invited plaintiff to contact Ms. Broussard if it believed that the work was outside the scope of the contract. Pl.'s App. 461. Plaintiff thanked Mr. Allen and reiterated its intent to proceed without any additional cost to the Coast Guard. Def.'s

App. 20. Mr. Allen later opined, during the pendency of this litigation, that the Coast Guard had some liability related to plaintiff's extra design effort, expressing his belief that the contract as awarded did not require the design to accommodate a future mezzanine. Pl.'s App. 313, 329–30, 332, 337–40.

Plaintiff resubmitted a complete 50% design on February 2, 2004, and its foundation calculations on February 3, 2004. Def.'s App. 12, 23. The Coast Guard approved the design three days later. Id. Plaintiff then submitted its 100% design on February 25, 2004. Id. at 13. In a cover letter to its review comments, the Coast Guard noted that it "consider[ed] the design, especially the Structural design, incomplete" and requested that plaintiff make corrections. Id.

### 3. Construction Begins

Plaintiff could not begin construction until the Coast Guard approved the final design. Pl.'s App. 180. That approval occurred some time before April 6, 2004, when plaintiff and the Coast Guard conducted a preconstruction conference. Def.'s App. 14. However, plaintiff did not begin construction immediately thereafter. Indeed, plaintiff's lack of progress on the job site caused the Coast Guard to send it a letter of concern on April 27, 2004, id. at 14–15; Pl.'s Supp'l App. 6, and a notice on May 6, 2004, that the lack of progress was endangering the project, Pl.'s Supp'l App. 7. Plaintiff ultimately began mobilizing for construction on May 1, 2004, Def.'s PFUF ¶ 20; Pl.'s Resp. DPFUF ¶ 20, with actual construction beginning during the week of May 10, 2004, Def.'s App. 16.

During a June 15, 2004 progress meeting, plaintiff and the Coast Guard discussed several issues related to constructing the foundation, pouring the slab, and erecting the building. Pl.'s App. 264–66. With respect to the foundation and slab, the Coast Guard expressed concern that plaintiff was "not following proper construction practices...." Id. at 266. This concern appears to be in reference to the fact that the structural drawing included with plaintiff's final design indicated that plaintiff would erect the building on the foundation after the slab was poured. Id. at 315. But, due to a concrete

shortage arising from the large amount of construction occurring in central Florida, plaintiff planned to alter the sequence of work, so that the slab would be poured after it erected the building. *Id.* at 266, 315; Pl.'s Supp'l App. 16. Plaintiff indicated that many contractors in the area were being forced "to implement non traditional construction sequences" due to the concrete shortage. Pl.'s Supp'l App. 16. Indeed, the Coast Guard acknowledged the effect the concrete shortage would have on the project, remarking that the project might not be completed by the July 26, 2004 contract completion date because the lead time for getting concrete on site was three weeks, and no loads could be placed on the poured concrete until it set, which typically took seven days or longer. Pl.'s App. 266. Nevertheless, it concluded that the building could not be erected without the slab in place, and therefore advised plaintiff that it was required to pour the slab before erecting the building. Pl.'s Supp'l App. 16.

Further complicating matters, the Coast Guard also informed plaintiff during the progress meeting that there was no space available on the job site to store the building before plaintiff was ready to erect it, and that plaintiff would have one week in which to store and erect the building once it arrived on site. *Id.*; Pl.'s App. 266. Plaintiff had originally scheduled three weeks for this process. Pl.'s Supp'l App. 16; *accord* Def.'s App. 3 (noting a building delivery date of March 4, 2004, and eight days of structural steel erection beginning on March 22, 2004). Finally, the Coast Guard noted during the meeting that the rainy season was about to begin. Pl.'s App. 266.

Two days after the meeting, plaintiff requested by letter an extension of the contract completion date to August 26, 2004, to accommodate the concrete shortage, explaining that it could not obtain the quantity of concrete it needed until July 9, 2004. Pl.'s Supp'l App. 19. The record does not contain any response from the Coast Guard to this request. Then, on June 18, 2004, plaintiff notified the Coast Guard in writing that it encountered ground water when it attempted to install an underground storm line. *Id.* at 43. It indicated that it would cost an additional $4,097 to remove the water from the area using stone and a gas-operated pump, a process it called "dewatering," and accordingly requested an increase in the contract price. Id. In a June 22, 2004 electronic-mail message, Mr. Allen informed plaintiff that the Coast Guard disagreed with plaintiff's assessment of the situation. *Id.* at 44. He noted that the depth of the water table and the depth of the storm pipe were specified in the contract and that the use of a sump pump for a few days would have been sufficient to deal with any water encountered. Id. Nevertheless, plaintiff resubmitted its request for a contract modification on June 22, 2004, indicating that the information in the contract documents did not suggest that ground water would be encountered. *Id.* at 45. It also requested a contract extension of ten days in addition to the monetary compensation it previously sought. *Id.*

On July 1, 2004, plaintiff sent the Coast Guard a progress schedule via electronic mail. *Id.* at 11, 49. As noted in the accompanying message, the schedule reflected a planned completion date of August 26, 2004, which was one month after the contract completion date. *Id.* The message also indicated that plaintiff was encountering previously unknown water pipes during its excavation of utilities, requiring adjustments to be made in the field. *Id.* at 49. The Coast Guard acknowledged plaintiff's submission and further noted that the new, delayed completion date would result in the assessment of liquidated damages. *Id.* at 11. Plaintiff then responded that it would "not accept responsibility for the delay" because the delay resulted from the Coast Guard's modification of plaintiff's "construction method." *Id.* at 12. It specifically referred to the request for a contract modification that it had submitted earlier in the day. *Id.* In that request, plaintiff sought an additional $5,100 and ten days for the removal of ground water it encountered in June when installing the storm drainage pipe. *Id.* at 15. Plaintiff also sought an additional $16,500 and thirty days for not being permitted to erect the building before pouring the slab, not being permitted to store and erect the building over the course of three weeks, and its inability to schedule

concrete with any certainty. *Id.* at 16. Thus, in total, plaintiff sought an additional $24,100 and forty days for performing the contract. *Id.* at 15.

As noted previously, plaintiff had informed the Coast Guard on June 19, 2004, that it had scheduled a delivery of concrete in an amount sufficient to pour the slab for July 9, 2004. *Id.* at 19, 25. However, on July 6, 2004, the Coast Guard informed plaintiff that it could not proceed with pouring the slab because the "workmanship and quality of the footings, concrete work, [and] anchor bolts" were unacceptable. *Id.* at 50; *accord id.* at 14, 34. Plaintiff was therefore required to reschedule the concrete delivery, which, due to the concrete shortage, could not be done until July 16, 2004. *Id.* at 13, 34. It laid the blame for this delay on the Coast Guard, asserting that the Coast Guard waited until the last minute to review the quality of the foundation, even though the foundation had been in place for three weeks. *Id.* at 13, 34, 50. Accordingly, plaintiff immediately informed the Coast Guard in writing that it would request a fourteen-day contract extension as a result of the delay. *Id.* at 13, 50.

On July 26, 2004, plaintiff submitted to the Coast Guard another request to modify the contract, seeking an additional seventy-one days and $34,300. *Id.* at 33–35. Plaintiff broke down this request into several components. *Id.* at 34. First, it sought additional time and compensation for the delays that were the subject of the July 1, 2004 modification request, *i.e.*, those related to the sequence of construction, the storage of the building, and the removal of water. *Id.* Second, it requested an additional twelve days and $8,000 for being unable to begin construction after the approval of a 35% design. *Id.* Third, it sought an additional fourteen days for the concrete placement delay. *Id.* Finally, it requested an additional five days and $2,200 for encountering previously unknown conditions during the excavation of utilities. *Id.*

The Coast Guard denied all but plaintiff's last request in a July 28, 2004 letter. *Id.* at 54–55. With respect to its refusal to allow plaintiff to erect the building before pouring the slab, the Coast Guard noted that plaintiff's proposal was a deviation from the approved drawings. *Id.* at 54. Thus, it indicated, to change the order of construction, plaintiff should have revised the drawings, obtained approval from its designer of record, and submitted the designer's approval to the Coast Guard. *Id.* Next, concerning plaintiff's removal of ground water, the Coast Guard indicated that its position that there was no basis for the request had not changed. *Id.* Then, addressing plaintiff's contentions regarding the ability to begin construction before a final design was approved, the Coast Guard remarked that the prerequisites to commencing construction were clearly set forth in the contract. *Id.* With respect to plaintiff's inability to pour the slab on July 9, 2004, it noted that it expressed concern about the quality of the foundation during the June 15, 2004 site visit and that two concrete trucks were rejected on June 11, 2004, because they sat too long waiting for plaintiff to be ready for the pour. *Id.* Finally, the Coast Guard requested additional information regarding the previously unknown water pipes plaintiff encountered during utility excavation. *Id.* at 55.

Plaintiff, in turn, responded to the Coast Guard in an August 9, 2004 letter. *Id.* at 56–57. It noted that the Coast Guard failed to address several issues it raised in its contract modification request. *Id.* It also provided the Coast Guard with information related to the unexpected water pipes it encountered during construction. *Id.* at 57. In an August 11, 2004 letter, the Coast Guard responded to plaintiff's contentions and granted plaintiff's request for additional compensation related to the unexpected water pipes. *Id.* at 98–99. The parties executed a contract modification on August 23, 2004, increasing the contract price by $4,500 (to a total of $539,430) but leaving the contract completion date unchanged. Pl.'s App. 232.

On September 22, 2004, plaintiff resubmitted to the Coast Guard its request for a contract modification related to dewatering. Pl.'s Supp'l App. 101. In this third request, plaintiff sought $3,800 and a seven-day contract extension. *Id.* The Coast Guard denied this request on September 27, 2004. *Id.*

While plaintiff was pursuing its contract modification requests with the Coast Guard, work was continuing on the job site. On July 14, 2004, the building was delivered. Def.'s App. 24–25. The Coast Guard authorized the pouring of the slab on July 15, 2004. Pl.'s Supp'l App. 14. And, one of plaintiff's subcontractors–BLB Inc.–began to erect the building on August 9, 2004. Def.'s App. 17.

### 4. Hurricane Season

Unfortunately for both plaintiff and the Coast Guard, construction was hindered by a number of hurricanes that affected central Florida during the summer of 2004. The first hurricane–Hurricane Charley–affected the job site in August 2004. On August 11, 2004, a Wednesday, plaintiff's representative noted, after conferring with Coast Guard officials, that plaintiff would need to secure the job site and trailer in advance of the hurricane. Pl.'s App. 267–68. The next day, BLB Inc. left the job site early due to the hurricane. *Id.* at 269–70, 277. BLB Inc. did not return until the following Monday, when it was only able to work six hours due to the weather. *Id.* at 271–74, 277. Upon his return to the job site on August 17, 2004, plaintiff's representative remarked that weather caused damage to thirteen rolls of insulation, which needed to be replaced. *Id.* at 275–76, 278–79, 284, 349. On August 23, 2004, he noted that BLB Inc.'s installation of insulation would be delayed by two weeks, when the new insulation was scheduled to arrive on site. *Id.* at 280–81.

In the meantime, on August 16, 2004, plaintiff requested a contract modification regarding the two days it lost due to Hurricane Charley. *Id.* at 277. Mr. Allen supported the two-day extension, which, as he noted several years later, did not cover time lost for mobilization and demobilization. *Id.* at 277, 348. Mr. Allen also supported granting plaintiff an additional thirteen-day extension due to the above-average rainfall in July and August, specifically noting that plaintiff had to demobilize for two or three days due to the hurricane. *Id.* In accordance with Mr. Allen's recommendation, the parties executed a contract modification on August 18, 2004, that provided:

Due to unusually high rainfall during the month of July and Hurricane Charley, the contract completion date is extended 15 calendar days. The new completion date is 10 August 2004. . . .

In consideration of the modification agreed to herein as complete and equitable adjustment for the contractor's proposal for adjustment, the contractor hereby releases the Government from any and all liability under the contract for further equitable adjustments attributable to such facts [or] circumstances giving rise to the proposal for adjustment, including all claims for impacts, delays and disruptions.

*Id.* at 23 1.

As of September 1, 2004, plaintiff anticipated completing the project by September 17, 2004. *Id.* at 284. However, plaintiff's plans were stymied by Hurricane Frances. On Thursday, September 2, 2004, plaintiff secured the job site in anticipation of the hurricane, planning to resume work after the Labor Day weekend. *Id.* at 285–86. Plaintiff ultimately resumed work on September 8, 2004, a day later than anticipated, due to its subcontractor's workers' lack of electricity, water, and gas, but could only work for half of the day due to rain. *Id.* at 287, 289–92. Moreover, plaintiff's representative noted that although the hurricane did not cause major damage, there was some insulation damage and minor flooding. *Id.* at 290.

With respect to the insulation, plaintiff's representative informed the Coast Guard, in a September 4, 2004 electronic-mail message, that the replacement insulation plaintiff ordered after Hurricane Charley still had not arrived on the job site. *Id.* at 288. Then, on September 10, 2004, he noted that delivery of the replacement insulation had been delayed until September 15, 2004, due to the approaching Hurricane Ivan. *Id.* at 294–95. The insulation was eventually delivered on September 16, 2004, and plaintiff's representative scheduled BLB Inc. to begin installation on September 20, 2004. *Id.* at 299–300.

In the meantime, in a September 9, 2004 letter, plaintiff requested a thirty-seven-day contract extension–as well as $6,700 for mobilization, demobilization, and overhead–for "time lost and delays during Hurricane Fran-

ces," noting that it was "still incurring delays due to shipment set backs because of road closures, damaged subcontractor facilities, and the once again approaching hurricane Ivan." *Id.* at 293; *accord id.* at 296, 302. Mr. Allen analyzed plaintiff's claim, noted that the Coast Guard had already given plaintiff "time for rain and Hurricane Charley impact from 7/26/04 until 8/10/04," and recommended allowing plaintiff an additional nine days for delays in August related to "excessive rain" and an additional seven days for delays in September due to "preparation" for Hurricanes Frances and Ivan and "excessive rain." *Id.* at 301. Mr. Allen informed plaintiff of his recommendation in a September 21, 2004 electronic-mail message: "Due to weather and hurricane delays, I am able to justify 16 days of weather related delay for the period 8/10/04 to 9/20/04. That is time, no money." *Id.* at 302. He suggested that if plaintiff sought additional time, it should comply with the weather clause in the contract specifications. *Id.* Later that day, in accordance with Mr. Allen's recommendation, the parties executed a contract modification, providing:

> Due to unusually high rainfall during the month of August and Hurricane[ ]s Frances and Ivan, the contract completion date is extended 16 calendar days. The new completion date is 27 August 2004....

> In consideration of the modification agreed to herein as complete and equitable adjustment for the contractor's proposal for adjustment, the contractor hereby releases the Government from any and all liability under the contract for further equitable adjustments attributable to such facts [or] circumstances giving rise to the proposal for adjustment, including all claims for impacts, delays and disruptions.

*Id.* at 233.

The next day, however, plaintiff's project manager purported to rescind the just-executed modification, indicating that the modification was inadvertently signed and sent without his knowledge. *Id.* at 305. In a September 22, 2004 electronic-mail message, he informed Ms. Broussard that plaintiff continued to request a thirty-seven-day contract extension and a $6,700 increase in the contract price, explaining that the severe

weather clause cited by Mr. Allen did not encompass claims related to demobilization and remobilization in response to severe weather. *Id.* Ms. Broussard responded as follows:

> I understand your concern, however, after discussing with our attorney, he states the[re] is no provision to provide relief for [demobilization/remobilization]. My suggestion is for you to submit a claim for the remaining days/monies you feel are due. [Mr. Allen] did an in-depth analysis of the days due to you, so if you can show anything above what he did, we may consider increasing our number. I've already processed the ... [modification] through our system which now shows the new [contract completion date]. Do you want me to cancel that [modification] and you'll then have to justify all the days, or leave it and let you claim additional days above the 16 [Mr. Allen] granted plus any costs?

*Id.* Plaintiff must not have followed through with its request for cancellation of the modification because the contract was never amended to reverse the sixteen-day extension of the contract completion date.

A fourth hurricane–Hurricane Jeanne–affected work on the job site in late September 2004 and caused Mr. Allen to speculate at that time that plaintiff would be entitled to an additional weather-related contract extension. *Id.* at 307, 350. As reflected in a September 29, 2004 internal memorandum prepared by Mr. Allen, when the Coast Guard inspected the site after the hurricane, it found that the building was undamaged. Id. at 308. It also found that plaintiff had not properly protected the uninstalled insulation and that only half remained usable, leading to Mr. Allen's belief that the erection of the building would be further delayed while even more replacement insulation was ordered. *Id.*

**5. Completion of the Building**

On November 4, 2004, Mr. Allen scheduled a final inspection of the project for November 10, 2004. Pl.'s Supp'l App. 58. Responding later that day, plaintiff indicated that the exterior paving would not be complete by the inspection date and asked whether the inspection should proceed as scheduled. *Id.*

Mr. Allen indicated that the Coast Guard could "still do a partial acceptance and defer total acceptance until paving work [was] completed assuming [the] remainder of [the] building [was] complete and [the] punchlist [was] relatively minor...." *Id.* Thereafter, on November 30, 2004, plaintiff sent an electronic-mail message to Ms. Broussard stating: "As a reminder: The power was turned on at St. Petersburg on 18 November 2004. Therefore, per our on site agreement with Steve Allen liquidated damages should stop as of that date due to the fact the building is classified as a warehouse. Please forward me your acknowledgment." *Id.* at 59. It appears that such acknowledgment did not occur. Rather, the Coast Guard conducted another inspection on December 1, 2004, at which time it accepted beneficial occupancy of the building. Pl.'s PUFF ¶ 15; Def.'s Resp. PPUFF ¶ 15; Def.'s PFUF ¶ 21; Pl.'s Resp. DPFUF ¶ 21.

Because the Coast Guard only awarded the contract's base option to plaintiff, it could not use the building as a warehouse after it was accepted. Pl.'s App. 322–23, 333, 337, 352. Indeed, the Coast Guard did not use the building for more than a year after its acceptance, leading to Mr. Allen's conclusion, several years later, that, with the exception of the inspection costs it incurred between October and December 2004, the Coast Guard was not "'harmed' by the late completion date." *Id.* at 313.

On February 3, 2005, the Coast Guard assessed liquidated damages against plaintiff by unilaterally amending the contract to reduce the contract price. *Id.* at 236. Before that date, the contract completion date had been extended, for reasons unrelated to the issues in the present motions, from August 27, 2004, to September 2, 2004. *Id.* at 234. Based on its December 1, 2004 acceptance of the building, the Coast Guard assessed ninety days of liquidated damages, which, at $564 per day, totaled $50,760.[3] *Id.* at 236. It therefore reduced the contract price to $488,670, id., depriving plaintiff of the $52,260 that it would have been paid had the

Coast Guard not assessed liquidated damages, *id.* at 309.

## C. Procedural History

Plaintiff submitted a claim to Ms. Broussard on July 28, 2005, seeking the payment of $51,260 that it alleges was wrongfully withheld by the Coast Guard as liquidated damages, plus interest. *Id.* Specifically, plaintiff contended:

The assessment of liquidated damages is not appropriate because [it] was not the sole cause of any alleged delays, any alleged delays by [it were] concurrent with delays caused by the government, the government failed to issue extensions to the completion date as a result of changes to the contract by the government, and the liquidated damages are an impermissible penalty.

*Id.* It requested a final decision on its claim, but also noted that "the assessment of liquidated damages is a claim by the government." *Id.* Ms. Broussard issued her decision on plaintiff's claim on August 22, 2005. *Id.* at 310–11. After acknowledging plaintiff's request for the remission of liquidated damages and noting that plaintiff had not completed work by the September 2, 2004 contract completion date, Ms. Broussard determined that plaintiff had not provided any information demonstrating why it was "not responsible for the delay," and that the Coast Guard was "not aware of any event or occurrence that would excuse [plaintiff's] late performance." *Id.* She therefore denied the claim. *Id.* at 311.

Less than one month later, plaintiff filed a complaint in the United States Court of Federal Claims ("Court of Federal Claims") challenging Ms. Broussard's decision. It alleged that during contract performance, "the Coast Guard changed and modified the contract in[,] among other ways, by failing to properly review and approve drawings [it] submitted ..., and by directing [it] to perform additional work that was not required by the Contract." Compl. ¶ 6. It also alleged that "[t]he Coast Guard failed to extend the Contract as a result of its actions, or inactions, and as

---

**3.** In the contract modification, the Coast Guard erroneously states that it was assessing sixty days of liquidated damages. Pl.'s App. 236. However-

er, the total amount assessed—$50,760—represents ninety days of liquidated damages at the contract rate of $564 per day.

required by the Contract because of the changes to the work directed by the Coast Guard." *Id.* ¶ 7. For these reasons, plaintiff sought the remission of $50,760 in liquidated damages retained by the Coast Guard. *Id.* at 3.

After the commencement of litigation, on June 15, 2006, plaintiff's attorney sent defense counsel a letter in support of plaintiff's claim for the remission of liquidated damages in which he discussed, among other topics, the purported delays related to the postaward kickoff meeting and the redesign of the building's foundation to accommodate a future mezzanine. Pl.'s Supp'l App. 60–65. The letter was forwarded to the Coast Guard and Mr. Allen circulated a draft response to Ms. Broussard and other Coast Guard personnel via electronic mail on June 29, 2006. *Id.* at 66–70. In the message to which the draft response was attached, Mr. Allen indicated his belief that the Coast Guard had some liability for the purported delays.[4] *Id.* at 66. Nevertheless, in a letter sent to plaintiff's attorney on January 18, 2007, defense counsel asserted that plaintiff was not entitled to the remission of any liquidated damages. *Id.* at 71–76.

In the meantime, on December 15, 2006, plaintiff submitted a second claim to Ms. Broussard, seeking payment of $34,300 and an eighty-eight-day contract extension for additional work performed at the Coast Guard's direction, indicating that its claim was based on the contentions set forth in its July 26, 2004 letter and other, unidentified "correspondence during the contract."[5] Pl.'s App. 312. In her January 16, 2007 letter denying plaintiff's claims, Ms. Broussard addressed each contention set forth in plaintiff's July 26, 2004 letter, but did not address any contentions that may have been set forth in other correspondence. *Id.* at 314–15. Shortly thereafter, plaintiff filed an unopposed motion to amend its complaint to add the allegations it presented to Ms. Broussard in its December 15, 2006 claim letter. Spe-

cifically, plaintiff sought to amend its complaint to assert a claim for a $34,300 increase in the contract price and an eighty-eight-day contract extension, Am. Compl. 3, alleging that despite Ms. Broussard's rejection of its claim, *id.* ¶¶ 12–13, it was "entitled to additional compensation and an extension to the contract as a result of changes directed by the Coast Guard," *id.* ¶ 19. The court granted plaintiff's unopposed motion and plaintiff thereafter filed its amended complaint.

After discovery, plaintiff moved for summary judgment on two issues: whether the contract's liquidated damages rate is a penalty and whether it is entitled to the remission of some of the retained liquidated damages due to excusable delays. On the latter issue, plaintiff argues that it is entitled to the remission of sixty-seven days of liquidated damages: thirty-two days for the Coast Guard's delay in convening the postaward kickoff meeting, eleven days for being required to change the design of the building's foundation to incorporate footers for a future mezzanine, and twenty-four days to compensate for the impact of Hurricanes Charley, Frances, Ivan, and Jeanne. Defendant cross-moved for summary judgment on these same issues, contending that the liquidated damages rate is not a penalty and that plaintiff is not entitled to the remission of sixty-seven days of liquidated damages for the reasons plaintiff cited. Defendant also moved for summary judgment with respect to what it refers to as the remaining twenty-three days of liquidated damages that plaintiff seeks to recover.

■■■■ After reviewing the briefs and evidence submitted in support of the parties' cross-motions for summary judgment, the court invited supplemental briefs from the parties concerning whether plaintiff had submitted a claim to Ms. Broussard that adequately informed her that it was seeking the remission of liquidated damages as the result of the purported delays described in its mo-

---

4. Mr. Allen repeated this belief during his June 10, 2009 deposition. *See* Pl.'s App. 328–32, 337–40.

5. Plaintiff's claim letter actually refers to a "July 24, 2004" letter. However, there is no letter

dated July 24, 2004 in the record before the court. Plaintiff states that the reference to a "July 24, 2004" letter was a typographical error, and Ms. Broussard's response to the claim letter supports its statement.

tion for partial summary judgment.[6] Defendant responded to the court's invitation by moving to dismiss the bulk of plaintiff's claims–plaintiff's requests for the remission of liquidated damages, an eighty-eight-day time extension, and a $34,300 increase in the contract price—for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").[7] During an October 25, 2012 status conference,[8] the court advised the parties that it did not require oral argument, but would hear argument if requested by the parties. Both parties declined the court's invitation.

## II. DISCUSSION

### A. Jurisdiction

As a preliminary matter, the court must address whether it has jurisdiction to entertain the majority of plaintiff's claims. In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor. *Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir.1995). However, plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction. *McNutt v. Gen. Motors Acceptance Corp.,*

298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction. *Land v. Dollar,* 330 U.S. 731, 735 & n.4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). If the court finds that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

Defendant's motion to dismiss is premised on its contention that, with respect to the majority of the allegations set forth in the complaint and the amended complaint, plaintiff did not submit to Ms. Broussard a valid claim under the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 601–613 (2000).[9] Under the CDA, a claim is valid only when a contractor satisfies the relevant procedural and substantive requirements of the statute and its implementing regulations. *See id.* § 605(a), (c); FAR 52.233–1(c). A valid claim is a jurisdictional prerequisite to filing suit. *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed.Cir. 2010); *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541 (Fed.Cir.1996). Defendant argues that most of plaintiff's July 28, 2005 claim letter and the entirety of

6. Defendant had not, prior to the court's request for supplemental briefs, challenged the court's jurisdiction. Plaintiff repeatedly cites this fact as evidence that detracts from defendant's jurisdictional argument. However, defendant's prior failure to challenge the court's jurisdiction is irrelevant. The court is obligated to satisfy itself that it possesses jurisdiction over the claims to be adjudicated. *See PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1241 (Fed.Cir.2002) ("Jurisdiction is a threshold issue, and a court must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits." (citations omitted)). Moreover, the court may raise the issue of jurisdiction at any time, even if it is not raised by the parties. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) ("The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." (citation omitted)); *Consolidation Coal Co. v. United States*, 351 F.3d 1374, 1378 (Fed.Cir.2003) ("[U]nder federal rules any court at any stage in the proceedings may address jurisdictional issues.").

7. The only claim not subject to defendant's motion is plaintiff's contention that the liquidated damages assessed by the Coast Guard constitute an unenforceable penalty.

8. The court convened this status conference to address defendant's October 5, 2012 notice indicating that the Coast Guard had discovered additional documents relevant to this case, that those documents had not been produced to plaintiff previously, and that defendant had produced those documents to plaintiff. During the status conference, plaintiff reported that it had reviewed the documents and concluded that they were not relevant to the present motions.

9. All citations to the CDA are to the version of the statute in effect on the date that the Coast Guard placed its order with plaintiff. Congress has since recodified title forty-one of the United States Code, revising and renumbering the provisions of the CDA. *See* Pub.L. No. 111-350, §§ 7101–7109, 124 Stat. 3677, 3816–26 (2011).

plaintiff's December 15, 2006 claim letter are not valid claims under the CDA. The court addresses each of these letters in turn.

### 1. The July 28, 2005 Claim Letter

■ Plaintiff submitted its first claim letter to Ms. Broussard on July 28, 2005, challenging the assessment of liquidated damages and requesting remission of the liquidated damages retained by the Coast Guard. Defendant concedes that the claim letter is valid with respect to plaintiff's contention that the liquidated damages constituted an impermissible penalty. However, it argues that the remainder of the claim letter is invalid because it did not provide Ms. Broussard with adequate notice of the basis of plaintiff's claim that the assessment and retention of liquidated damages was inappropriate. In other words, defendant asserts, plaintiff did not provide any details to substantiate its assertions that it "was not the sole cause of any alleged delays," that "any alleged delays by [it were] concurrent with delays caused by the government," or that "the government failed to issue extensions to the completion date as a result of changes to the contract by the government...." Pl.'s App. 309.

■ In addressing defendant's contention, the threshold question is whether the liquidated damages issue in this case should be analyzed as a government claim against a contractor or as a contractor's claim against the government. As a general proposition, the government's assessment of liquidated damages is a government claim against a contractor, *Sun Eagle Corp. v. United States,* 23 Cl.Ct. 465, 480 (1991), and can be directly appealed to the Court of Federal Claims, *Garrett v. Gen. Elec. Co.,* 987 F.2d 747, 749 (Fed.Cir.1993). Thus, the Coast Guard's unilateral modification of the contract to reduce the total contract price by the amount of assessed liquidated damages was a government claim against plaintiff at the time the Coast Guard issued the modification. *See* FAR 52.233–1(c) (defining a claim as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract"); *Placeway Constr. Corp. v. United States,* 920 F.2d 903, 906–07 (Fed.Cir.1990) (holding that the contracting officer's assertion of a right of set off by declining to release the balance of the contract price is a government claim); [10] *see also Placeway Constr. Corp.,* 920 F.2d at 907 ("The decision is no less final because it failed to include boilerplate language usually present for the protection of the contractor."); *Alliant Techsys., Inc. v. United States,* 178 F.3d 1260, 1268 (Fed.Cir.1999) (noting that a document "can be a final decision under the CDA even if it lacks the standard language announcing that it constitutes a final decision.").

However, plaintiff did not directly appeal the government's claim. Instead, it submitted the July 28, 2005 claim letter to Ms. Broussard, requesting a final decision regarding the remission of liquidated damages.[11] The United States Claims Court ("Claims Court") encountered a similar situation in *Sun Eagle Corp.* In that case, the government reduced the amount on the contractor's invoice by $18,400 to reflect its retention of assessed liquidated damages. 23 Cl.Ct. at 481. The contractor subsequently submitted a claim letter to the government demanding remission of the retained liquidated damages, arguing that the government was responsible for the delay in completing the contract. *Id.* at 469, 481–82. In the same claim letter, the contractor demanded payment for the costs associated with the additional work. *Id.* The court concluded:

---

**10.** The Court of Federal Claims Technical and Procedural Improvements Act of 1992 superseded a portion of the decision in *Placeway Construction Corp.* not relevant to this case. *See* Pub.L. No. 102–572, § 907(b), 106 Stat. 4506, 4519 (permitting the Court of Federal Claims to render judgment in nonmonetary disputes arising under the CDA).

**11.** In the claim letter, plaintiff identified the assessment of liquidated damages as a government claim but made no attempt to reconcile that fact with its request for a final decision on the same issue.

[A] claim for liquidated damages is the quintessential government claim. Nevertheless, when a contractor challenges a liquidated damages assessment by making claim in a claim letter for the amount withheld, the contractor also is making a contractor claim.

*Id.* at 480; *see also id.* at 482 ("[The contractor] is seeking an adjustment of contract terms or monetary relief because it defends against the assessment of liquidated damages on the basis that the [government] caused the delay. The claim is a claim by the contractor."). In other words, there was both a government claim and a contractor claim on the liquidated damages issue. A similar situation exists in this case. By assessing liquidated damages through the retention of a portion of the contract price, the Coast Guard asserted a claim against plaintiff. And, by submitting a letter to Ms. Broussard in which it (1) sought the remission of the liquidated damages retained by the Coast Guard, (2) contended that the Coast Guard was at least partially responsible for any alleged delays, and (3) requested the payment of interest on the retained liquidated damages,[12] plaintiff asserted a claim against the Coast Guard.[13]

 Having concluded that plaintiff asserted a claim against the Coast Guard in its July 28, 2005 claim letter, the court must next determine whether that claim was valid. As noted above, to be valid, a claim must satisfy the procedural and substantive requirements set forth in the CDA and its implementing regulations. *See generally* 41 U.S.C. § 605; FAR 52.233–1(c). In general, the claim must be in writing, submitted to the contracting officer within six years of its accrual, and include a request for monetary or other relief as a matter of right. *Id.* Although the claim need not "be submitted in any particular form or use any particular wording," it must contain "a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning Maint., Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987); *see also Transam. Ins. Corp. v. United States,* 973 F.2d 1572, 1578 (Fed.Cir.1992) (noting that "certain 'magic words' need not be used and that the intent of the 'claim' governs"). To determine whether a contractor's demand constitutes a claim, a court must engage in a "logical, common sense analysis" of the demand, *Transam. Ins. Corp.,* 973 F.2d at 1579, taking into consideration the facts and circumstances of the case, *Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1575 (Fed.Cir.1995) (en banc).

Here, the only issue is whether plaintiff's letter gave Ms. Broussard adequate notice of the basis of its claim against the Coast Guard. In demanding the remission of liquidated damages, plaintiff contended that it "was not the sole cause of any alleged delays," that "any alleged delays by [it were] concurrent with delays caused by the government," and that "the government failed to issue extensions to the completion date as a result of changes to the contract by the government...." Pl.'s App. 309. Plaintiff did not specify the "alleged delays" for which the Coast Guard bore responsibility or the "changes" that the Coast Guard failed to compensate with time extensions. The question before the court is: Was plaintiff's claim letter sufficiently detailed to provide adequate notice to Ms. Broussard?

Certainly, at the time she received plaintiff's July 28, 2005 claim letter, Ms. Broussard personally was aware that plaintiff had formally requested several time extensions throughout the course of contract performance. Plaintiff had requested from her a

---

**12.** As the court noted in *Sun Eagle Corp.,* the CDA only permits the payment of interest for successful contractor claims, and not for a contractor's successful defense of a government claim. *See* 23 Cl.Ct. at 480, 482 (citing 41 U.S.C. § 611; *Ruhnau–Evans–Ruhnau Assocs. v. United States,* 3 Cl.Ct. 217, 218 (1983)).

**13.** Because plaintiff submitted a claim to Ms. Broussard asserting defenses to the assessment of liquidated damages, the court need not address whether plaintiff was required to submit such a claim in the first instance. It notes, however, that in *M. Maropakis Carpentry, Inc.,* the United States Court of Appeals for the Federal Circuit ("Federal Circuit") held that a contractor "seeking an adjustment of contract terms"— *e.g.,* a time extension for government-caused delays–in defense to the government's assessment of liquidated damages must submit a claim to the contracting officer. 609 F.3d at 1329–32.

one-month extension on June 17, 2004; a ten-day extension on June 22, 2004; a forty-day extension (which included the ten days, and may have included the month, requested previously) on July 1, 2004; a seventy-one day extension (which included the forty days requested previously) on July 26, 2004; a two-day extension on August 16, 2004; a thirty-seven day extension on September 9, 2004; and a seven-day extension on September 22, 2004.[14] In other correspondence and reports, plaintiff mentioned delays it was encountering without requesting a corresponding time extension. For example, plaintiff mentioned in these other documents delays in redesigning the building's foundation, delays in the delivery of insulation, and delays related to demobilizing and mobilizing in response to the hurricanes. Plaintiff argues that this collection of correspondence and documentation provided Ms. Broussard with adequate notice of its claim and it therefore was not required to restate the allegations contained in this correspondence and documentation in its claim letter.

After considering the facts and circumstances of this case, the court concludes that plaintiff, in its July 28, 2005 claim letter, provided Ms. Broussard with adequate notice of at least some of the basis of its claim. Plaintiff's claim letter is not the ideal example of a claim letter. While plaintiff generally apprised Ms. Broussard of its position that it was not responsible for the delay in contract completion, it did not identify which delays were caused solely by the Coast Guard. However, the content of Ms. Broussard's response to plaintiff's claim letter persuades the court that Ms. Broussard was sufficiently cognizant of at least part of the basis of plaintiff's claim. As noted above,

Ms. Broussard wrote in her decision that plaintiff had not provided any information demonstrating why it was "not responsible for the delay," and that the Coast Guard was "not aware of any event or occurrence that would excuse [plaintiff's] late performance." Pl.'s App. 310–11. These statements can be reasonably read to indicate that plaintiff did not provide the Coast Guard with any information beyond what it already presented that would substantiate its claim for the remission of liquidated damages; in other words, Ms. Broussard was just restating the Coast Guard's prior rejections of plaintiff's requests for time extensions. Indeed, Ms. Broussard did not indicate that she found plaintiff's demand to be vague or request that plaintiff clarify its demand, which strongly suggests that she had some minimal awareness of the basis of plaintiff's claim. Thus, to the extent that plaintiff's claim for the remission of liquidated damages set forth in its July 28, 2005 claim letter was based on its formal requests for time extensions,[15] the letter states a valid claim under the CDA.

On the other hand, the basis for plaintiff's July 28, 2005 claim for the remission of liquidated damages cannot be found in the other correspondence and documentation that plaintiff generated during the course of contract performance. Plaintiff argues that all of the documents it generated can be read together to constitute a single claim for the remission of liquidated damages. It relies on the proposition that "[w]hen appropriate, a series of letters can be read together to comprise a clear and unequivocal statement giving the contracting officer notice of the basis for the contractor's claim." *Exec. Court Reporters, Inc. v. United States,* 29 Fed.Cl. 769, 774 (1993), *appeal dismissed,* 22

---

14. The court recognizes that the two requests concerning hurricane-related delay resulted in bilateral contract modifications, and that these two modifications contain language releasing the Coast Guard from further liability on the issues addressed by the modifications. However, the record contains evidence reflecting plaintiff's position that the modifications did not address certain hurricane-related delay, such as mobilization and demobilization efforts. For the purposes of ruling on defendant's motion to dismiss, the court assumes, without deciding, that there were outstanding issues related to plaintiff's hurricane-related time extension requests

and that Ms. Broussard was aware of those issues. The court returns to this issue when addressing the parties' cross-motions for summary judgment.

15. The record before the court includes, as described above, seven such formal requests. See Pl.'s App. 277 (August 16, 2004 electronic-mail message describing attached letter), 293 (September 9, 2004 letter); Pl.'s Supp'l App. 15–16 (July 1, 2004 letter), 19 (June 17, 2004 letter), 33–35 (July 26, 2004 letter), 45 (June 22, 2004 letter), 101 (September 22, 2004 letter).

F.3d 1106 (Fed.Cir.1994). However, plaintiff has cited no case law suggesting that the "series of letters" may consist of anything other than correspondence sent to the contracting officer that includes an assertion of entitlement to some form of relief. Indeed, the court discovered only one decision that might support plaintiff's position: *Al Munford, Inc. v. United States*, 30 Fed.Cl. 185 (1993). In that nonbinding decision, the court held that a contractor's certified list of expenses prepared during litigation in federal district court and a letter sent to the contracting officer during that litigation in which the contractor stated that it was asserting a claim for monetary relief adequately notified the contracting officer that the contractor sought a final decision. *Id.* at 188–91. The court also held that the contractor provided the contracting officer with the basis of its claim via its district court

complaint and its correspondence with the contracting officer during contract performance addressing why the delays in contract performance were excusable. *Id.*

In all of the other decisions addressing whether a series of documents, when read together, might constitute a claim, the courts have considered only correspondence in which a contractor asserted entitlement to relief.[16] The courts' reliance on such correspondence is understandable in light of one of the main purposes of the CDA–to achieve a "more efficient and fair resolution of contract claims and disputes." H.R.Rep. No. 95–1556, at 6 (1978). If contracting officers were required to examine every piece of paper generated by the contractor during the performance of the contract to discern the basis of the contractor's claim, the administrative resolution of claims would be-

---

**16.** *See, e.g., Contract Cleaning Maint., Inc.*, 811 F.2d at 592 (holding that a letter in which the contractor claimed entitlement to monetary relief and a letter in which the contractor claimed entitlement to additional monetary relief, read together, constituted a claim under the CDA); *N. Star Alaska Hous. Corp. v. United States*, 76 Fed.Cl. 158, 185–86 (2007) (declining to "cobble[ ] together" claims from "cost, billing or other accounting information" and the "various requests made by plaintiff for money owed," and holding that multiple documents could not form a claim "where various documents list the costs involved with an issue, but no document definitively claims all or some specified amount of those costs"), *appeal dismissed*, 226 Fed.Appx. 1004 (Fed.Cir.2007); *Ulysses, Inc. v. United States*, 66 Fed.Cl. 161, 165 (2005) (holding that three letters that predated the challenged government action could not, even if read together, constitute a claim); *CW Gov't Travel, Inc. v. United States*, 63 Fed.Cl. 369, 375–78, 383–84 (2004) (noting that a series of four letters–each of which contained the contractor's request for the government's interpretation of a contract term and a final decision from the contracting officer–constituted a claim); *Clearwater Constructors, Inc. v. United States*, 56 Fed.Cl. 303, 305–06, 310–11 (2003) (holding that a contractor's letter requesting a decision from the contracting officer on the grounds set forth in the attached letter from its subcontractor, read in conjunction with the subcontractor's letter formally protesting the government's contract interpretation and requesting that the contractor submit a claim to the contracting officer, constituted a claim); *Kalamazoo Contractors, Inc. v. United States*, 37 Fed.Cl. 362, 369 (1997) (concluding that neither a letter in which the contractor asserted that liquidated damages were inappropriate, "nor any other document or correspondence," notified the

contracting officer that plaintiff was asserting a claim for money due under the contract); *Exec. Court Reporters, Inc.*, 29 Fed.Cl. at 772 (noting that in each letter constituting the claim, plaintiff "repeated its claim for termination for convenience, requested a formal contracting officer's final decision on the matter, and informed the contracting officer that a failure to render such a decision would constitute a denial of plaintiff's claim"); *Blake Constr. Co. v. United States*, 28 Fed.Cl. 672, 681–82 (1993) (reading together as a CDA claim a written request for contract modification, a written request for a decision from the contracting officer, and a letter characterizing the contract modification request as a properly certified claim), *aff'd mem.*, 29 F.3d 645 (Fed.Cir. 1994); *Kvaas Constr. Co. v. United States*, 22 Cl.Ct. 740, 742 (1991) (concluding that a cost proposal, a rejection of the proposal, a letter describing a subcontractor's protest, and a claim letter, considered together, constituted a claim); *W. Coast Gen. Corp. v. United States*, 19 Cl.Ct. 98, 100 (1989) (considering together two letters in which the contractor asserted "its right to an adjustment of the contract terms as required by the Disputes clause," "referenced the work in question, and contained [its] assertion that the work had been deleted by the solicitation amendment"); *Alliance Oil & Ref. Co. v. United States*, 13 Cl.Ct. 496, 499 (holding that three letters—"a written protest to the contracting officer in the January 24, 1986 letter, followed by the February 6 and March 4, 1986 letters protesting payment pursuant to two invoices"—taken together "constituted a clear and unequivocal statement that gave the contracting officer notice of the basis for the claim"), *aff'd per curiam*, 856 F.2d 201 (Fed.Cir.1988) (unpublished table decision).

come extremely unwieldy. And, if contracting officers were required to examine only the correspondence, and not all documents, generated by the contractor during contract performance, they would still have the time-consuming task of determining whether each particular piece of correspondence related to the contractor's claim. For example, in this case, plaintiff and the Coast Guard exchanged several electronic-mail messages regarding the rescheduling of the postaward kickoff meeting, and in one of the messages, plaintiff requested that the Coast Guard issue a limited notice to proceed to accelerate the design and construction phases of the project. If plaintiff's position prevailed, Ms. Broussard, upon receiving plaintiff's July 28, 2005 claim for the remission of liquidated damages, would have been required to read this message and determine whether it constituted an assertion of government delay upon which plaintiff was basing its claim. On its face, the message does not appear to assert a government delay, and thus it would have been reasonable for Ms. Broussard to disregard it when considering plaintiff's July 28, 2005 claim letter. However, it is possible that plaintiff had this message in mind when submitting its claim. It is not difficult to see how the process could become overly burdensome, imprecise, and therefore inefficient.

 Ultimately, it is the contractor's burden to provide the contracting officer with adequate notice of the basis of its claim. A contractor cannot abdicate this responsibility and foist it upon the contracting officer. *See Contract Cleaning Maint., Inc.*, 811 F.2d at 592 (requiring a contractor to "submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim"); *BLR Grp. of Am., Inc. v. United States*, 94 Fed.Cl. 354, 374 (2010) ("[T]he responsibility to articulate a claim ... rests squarely with the contractor."), *appeal dismissed*, 460 Fed.Appx. 918 (Fed.Cir.2011); *AAB Joint*

*Venture v. United States*, 75 Fed.Cl. 414, 422 (2007) ("It is not the responsibility of the contracting officer to anticipate, and attempt to resolve, any and all potential claims that could eventuate based on documents that are attached to a claim that is before him."); *Dodson Livestock Co. v. United States*, 42 Fed.Cl. 455, 462 (1998) ("The submission of claims to the contracting officer ... should not be implied, but must be performed with sufficient specificity to permit the full and intelligent consideration of the claim by the contracting officer."). Thus, to effectuate one of the underlying purposes of the CDA, and following the overwhelming majority of the case law, the court declines to consider the entire body of correspondence and documentation generated by plaintiff as part of its July 28, 2005 claim for the remission of liquidated damages.[17]

In sum, plaintiff set forth a valid CDA claim for the remission of liquidated damages in its July 28, 2005 claim letter, the basis of which is found in the formal requests for time extensions that it submitted to the contracting officer during contract performance.

**2. The December 15, 2006 Claim Letter**

Defendant next contends that plaintiff's December 15, 2006 claim letter does not constitute a valid claim with respect to plaintiff's request for an eighty-eight-day contract extension. As noted above, in its original complaint, plaintiff sought only the remission of liquidated damages, alleging that the Coast Guard "changed," "modified," and "failed to extend" the contract. Compl. ¶¶ 6–7. Plaintiff subsequently submitted a claim letter to Ms. Broussard seeking payment of $34,300 and an eighty-eight-day contract extension for additional work performed at the Coast Guard's direction. Defendant argues that plaintiff, by alleging in its original complaint that the Coast Guard changed the contract requirements without extending the time required to perform the changed work, was precluded from filing a claim for time exten-

---

17. One of the documents that cannot serve as the basis of plaintiff's July 28, 2005 claim is its attorney's June 15, 2006 letter to defense counsel. Among other problems, the letter postdates both plaintiff's July 28, 2005 claim letter and Ms. Broussard's August 22, 2005 denial of plaintiff's claim. Thus, at the time Ms. Broussard was considering plaintiff's claim, she necessarily would have been unaware that plaintiff based its claim for the remission of liquidated damages on the information contained in the letter.

sions with Ms. Broussard while litigation on the original complaint was pending. As a result, defendant contends, Ms. Broussard's January 16, 2007 decision was a nullity with respect to plaintiff's claim for an eighty-eight-day contract extension, rendering plaintiff's appeal of that aspect of the decision inoperative. The court agrees.

"Once a claim is in litigation, the Department of Justice gains exclusive authority to act in the pending litigation. That exclusive authority divests the contracting authority to issue a final decision on the claim." *Sharman Co. v. United States*, 2 F.3d 1564, 1571–72 (Fed.Cir.1993) (citations omitted), *overruled on other grounds by Reflectone, Inc.*, 60 F.3d at 1572. Thus, if a contractor submits a new claim to the contracting officer while its prior claim is in litigation, and the new claim "arise[s] from the same operative facts, claim[s] essentially the same relief, and merely assert[s] differing legal theories for that recovery," *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed.Cir.2003), the contracting officer lacks the authority to act on the new claim. On the other hand, the contracting officer is not divested of its authority to act on new, different claims asserted by the contractor. *See Case, Inc. v. United States*, 88 F.3d 1004, 1010–11 (Fed.Cir.1996) (holding that the claim the contractor pursued in the original lawsuit was different from the claim that the contractor subsequently submitted to the contracting officer even though both claims "arose out of the same underlying set of facts"); *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct.Cl.1976) (noting that the authority of the United States Department of Justice ("DOJ") to control litigation in which the United States is a party is "broadly inclusive" and therefore "must be narrowly construed," and further concluding that the DOJ's authority "is limited to the conduct of pending litigation against the Government, and does not encompass exclusive control of other matters which, albeit related, are not yet so pending"); *see also Joseph Morton Co. v. United States*, 757 F.2d 1273, 1281 (Fed.Cir.1985) (noting that Congress intended "the word 'claim' to mean ... each claim under the CDA for money that is one part of a divisible case").

Applying these precepts, the Federal Circuit in *Case, Inc.* concluded that a contractor's lawsuit did not preclude the contractor from submitting a new claim to the contracting officer. Specifically, in its original lawsuit before the Court of Federal Claims, the contractor challenged a "default termination and the government's claim for unliquidated progress payments in the principal amount of $2,806,448.43." 88 F.3d at 1010. After filing suit, the contractor submitted another claim to the contracting officer seeking both an equitable adjustment to the contract price in an amount "over and above the progress payments it had received and to which it claimed entitlement" in its prior claim and lost profits, "in the total principal amount of $1,840,674.03." *Id.* Although the two claims "arose out of the same underlying set of facts," the Federal Circuit concluded that the claims were not the same because they did not involve "precisely 'the same money'" and were not each other's "'mirror image.'" *Id.* (quoting *Sharman Co.*, 2 F.3d at 1571, 1573). It therefore held that the second claim was not in litigation when the contractor submitted it to the contracting officer. *Id.* at 1011.

The Court of Federal Claims has conducted similar analyses. For example, in *Sipco Services & Marine Inc. v. United States*, the government terminated its contract with the contractor for default. 30 Fed.Cl. 478, 481 (1994). In its complaint, the contractor sought the remainder of the contract balance, conversion of the default termination into a termination for the government's convenience, and costs for additional work it performed. *Id.* In a subsequent claim, the contractor sought reimbursement for the payments it made to its surety for the surety's completion of the contract. *Id.* at 481, 486. The court found that the contractor's reimbursement claim was related to the claims set forth in the complaint, but "not so related that it constitute[d] the same claim under the CDA." *Id.* at 486. It explained that in the reimbursement claim, which concerned "monies paid to its surety for the surety's completion of the contract and investigation of the [government's] claim," the contractor sought "monies that it would not necessarily obtain from its claim for conver-

sion, the contract balance, or its termination costs." *Id.*

■ In this case, plaintiff, in its initial complaint, sought the remission of liquidated damages retained by the Coast Guard in the amount of $51,260. It subsequently submitted a claim letter to Ms. Broussard requesting a $34,300 increase in the contract price and an eighty-eight-day contract extension for additional work done on the contract. Unquestionably, the two claims are based on the same underlying facts. Indeed, plaintiff asserts that all of the relief it requests–the remission of liquidated damages, an eighty-eight-day contract extension, and an increase in the contract price–is due to the same alleged Coast Guard delays and changes. And, the time extension sought by plaintiff in its second claim is essentially the same relief it sought in its first claim. Under either of the claims, if plaintiff were able to establish that the Coast Guard caused or contributed to a particular delay, it would receive a credit for the length of the delay. That credit is both an extension of the contract completion date and a reduction in the number of days for which the Coast Guard could assess liquidated damages. Accordingly, with respect to the requested eighty-eight-day time extension, plaintiff's December 15, 2006 claim is the same claim that plaintiff articulated in its July 28, 2005 letter and pursued in its initial complaint. Accordingly, Ms. Broussard was divested of authority to issue a decision regarding the time extension, rendering Ms. Broussard's denial of the time extension inoperable and unappealable.

■ However, Ms. Broussard was not divested of authority to render a decision regarding the other relief sought by plaintiff in its December 15, 2006 claim letter–a $34,300 increase in the contract price. Neither plaintiff's July 28, 2005 claim nor its initial complaint included a request for an increase in the contract price. Thus, plaintiff's December 15, 2006 monetary request constituted a new claim. And, this new claim met all of the CDA's requirements. It was timely sub-mitted. It contained a demand for payment of a sum certain as a matter of right. And, it provided Ms. Broussard with adequate notice of the basis of plaintiff's demand–plaintiff clearly identified its July 26, 2004 letter as one of the documents upon which it based its claim,[18] and in that letter, plaintiff described the basis for, among other things, the monetary portion of its claim. Accordingly, the demand for a $34,300 increase in the contract price that plaintiff included in its December 15, 2006 claim letter is a valid claim, Ms. Broussard had the authority to rule on the claim, and this court has jurisdiction to entertain plaintiff's appeal of Ms. Broussard's decision.

Having determined that the court has jurisdiction to entertain plaintiff's claims for the remission of liquidated damages and an increase in the contract price, the court turns to the parties' arguments on the merits.

**B. Motions for Summary Judgment**

The parties have both moved for summary judgment pursuant to RCFC 56. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. *Id.* at 324, 106 S.Ct. 2548. Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made

---

**18.** As noted above, plaintiff incorrectly referred to a nonexistent July 24, 2004 letter in its December 15, 2006 claim letter. Because Ms. Broussard recognized in her January 16, 2007 decision that plaintiff meant to refer to its July 26, 2004 letter, defendant's contention that Ms. Broussard was not obligated to ascertain the actual letter to which plaintiff meant to refer is moot.

for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the court must not weigh the evidence or make findings of fact. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed.Cir.2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact ...."), *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed.Cir.2008) (en banc); *Ford Motor Co. v. United States*, 157 F.3d 849, 854 (1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); *Mansfield v. United States*, 71 Fed.Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues."). Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. However, if neither party meets this burden on the filing of cross-motions for summary judgment, then the court must deny both motions. *See, e.g., Canal 66 P'ship v. United States*, 87 Fed.Cl. 722, 723 (2009); *Dick Pac./ GHEMM, JV v. United States*, 87 Fed.Cl. 113, 126 (2009).

### 1. Enforceability of Liquidated Damages Clauses

Plaintiff first seeks a ruling that the liquidated damages clause in its contract with the Coast Guard is unenforceable. Liquidated damages are used "to allocate the consequences of a breach before it occurs," *Jennie–O Foods, Inc. v. United States*, 580 F.2d 400, 412 (Ct.Cl.1978) (per curiam), which "save[s] the time and expense of litigating the issue of damages," *DJ Mfg. Corp. v. United States*, 86 F.3d 1130, 1133 (Fed.Cir. 1996). Liquidated damages "serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts." *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411, 68 S.Ct. 123, 92 L.Ed. 32 (1947). Thus, "[w]here parties have by their contract agreed upon a liquidated damages clause as a reasonable forecast of just compensation for breach of contract and damages are difficult to estimate accurately, such provision should be enforced." *Jennie–O Foods, Inc.*, 580 F.2d at 413–14; *see also* FAR 11.501 (noting that use of a liquidated damages clause is proper if damages "would be difficult or impossible to estimate accurately or prove" and that the "rate must be a reasonable forecast" of the anticipated damages).

On the other hand, courts will not enforce a liquidated damages clause when the amount of liquidated damages is "plainly without reasonable relation to any probable damage which may follow a breach," *Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 226, 50 S.Ct. 142, 74 L.Ed. 382 (1930), or is "so extravagant, or so disproportionate to the amount of property loss, as to show that compensation was not the object aimed at or as to imply fraud, mistake, circumvention, or oppression," *Wise v. United States*, 249 U.S. 361, 365, 39 S.Ct. 303, 63 L.Ed. 647 (1919). In these circumstances, liquidated damages amount to a penalty. *Priebe & Sons, Inc.*, 332 U.S. at 413, 68 S.Ct. 123; *United States v. Bethlehem Steel Co.*, 205 U.S. 105, 118–21, 27 S.Ct. 450, 51 L.Ed. 731 (1907).

When presented with a challenge to a liquidated damages clause, a court must judge the clause "as of the time of making

the contract" and without regard to the amount of damages, if any, actually incurred by the nonbreaching party. *Priebe & Sons, Inc.*, 332 U.S. at 412, 68 S.Ct. 123; *accord Bethlehem Steel Co.*, 205 U.S. at 119, 27 S.Ct. 450 (noting that courts will enforce liquidated damages clauses "without proof of the damages actually sustained"); *Steve Kirchdorfer, Inc. v. United States*, 229 Ct.Cl. 560, 565–67 (1981) (upholding an award of liquidated damages although no actual damages were sustained); *Young Assocs., Inc. v. United States*, 471 F.2d 618, 622 (Ct.Cl.1973) ("It is enough if the amount stipulated is reasonable for the particular agreement at the time it is made."). The party challenging a liquidated damages clause–typically, in government procurement cases, the contractor–bears the burden of proving that the clause is a penalty. *DJ Mfg. Corp.*, 86 F.3d at 1134; *Jennie–O Foods, Inc.*, 580 F.2d at 414. The burden is a heavy one "because when damages are uncertain or hard to measure, it naturally follows that it is difficult to conclude that a particular liquidated damages amount or rate is an unreasonable projection of what those damages might be." *DJ Mfg. Corp.*, 86 F.3d at 1134. And because of this difficulty, it is generally improper for a court "to inquire into the process that the contracting officer followed in arriving at the liquidated damages figure that was put forth in the solicitation and agreed to in the contract." *Id.* at 1137; *see also id.* at 1136 (noting that courts will enforce a liquidated damages clause, "regardless of how the liquidated damage figure was arrived at," if the amount of liquidated damages is reasonable).

In this case, plaintiff does not challenge the propriety of including a liquidated damages clause in its contract with the Coast Guard.[19] Rather, in this phase of the litigation, it focuses on the reasonableness of the liquidated damages rate set forth in the clause, contending that a rate of $564 per day is a penalty because it "bears no reasonable relationship to any additional costs the [Coast Guard] could have reasonably anticipated in the event the Contract was delayed. . . ." Mot. 7. Specifically, plaintiff argues that the Coast Guard's calculation of the liquidated damages rate was arbitrary and unsupported, and that some components of the rate should not have been included.

Before it addresses plaintiff's arguments, the court directs its attention to defendant's assertion that those arguments are untimely because a challenge of a liquidated damages clause is permitted only at the time of contract formation. As the court explains below, the case law defendant relies upon fails to support its position.

The principal decision upon which defendant relies is *P & D Contractors, Inc. v. United States*, 25 Cl.Ct. 237 (1992), *aff'd mem.*, 985 F.2d 583 (Fed.Cir.1992). In that case, the Claims Court held: "Reasonableness [of the liquidated damages] . . . is to be determined at the time of [contract] execution. [The contractor] failed to argue the reasonableness of the liquidated damages at the time it executed the contract. Therefore, [the contractor] is foreclosed from doing so now."[20] *Id.* at 241 (citation omitted). The court cited another decision from the Claims Court–*Cegers v. United States* –in support of its holding. *Id.* The Claims Court in *Ceg-*

---

**19.** Nevertheless, plaintiff notes that Ms. Broussard, before deciding to include a liquidated damages clause in the contract, did not (1) make specific findings concerning the potential impact that the use of a liquidated damages clause might have on pricing, competition, and contract administration or (2) document that she considered the importance of delivery time or timely performance. Plaintiff implies that Ms. Broussard's failure to take these actions violated the FAR. However, because plaintiff does not challenge the use of a liquidated damages clause in its contract with the Coast Guard per se, these particular facts are irrelevant.

**20.** It bears noting that notwithstanding this statement, the Claims Court did, in fact, analyze whether the liquidated damages clause at issue was reasonable. *See P & D Contractors, Inc.*, 25 Cl.Ct. at 240–41. Indeed, earlier in the decision the court held that "the liquidated damages provision in this case, and the liquidated damages set out in NAVFAC P–68 on which it is based, [were] reasonable," *id.* at 240, and after it ruled on timeliness, it held that "the liquidated damages provision in this case [met] the reasonableness requirement . . . and, consequently, the provision was enforceable," *id.* at 241. Thus, the timing of plaintiff's challenge was not the primary nor the sole reason for the court's upholding of the liquidated damages clause.

ers "recognize[d] ... the rule of law that the reasonableness of a stipulated liquidated damages amount should be determined at the time a contract is executed." 7 Cl.Ct. 615, 620 (1985). As noted in *P & D Contractors, Inc.*, the *Cegers* court relied on the United States Supreme Court's ("Supreme Court") decision in *Priebe & Sons, Inc.* as the source of this "rule of law."

Accordingly, it is apparent that the legal principle advanced in *P & D Contractors, Inc.* can be directly traced back to *Priebe & Sons, Inc.*, in which, as noted above, the Supreme Court provided that a court must judge a liquidated damages clause "*as of* the time of making the contract."[21] 332 U.S. at 412, 68 S.Ct. 123 (emphasis added). This binding precedent directs the court to examine the conditions that existed at the time of contract formation, but does not prevent the court from examining those conditions after a breach has occurred, which may be several years later. Defendant has not cited any binding precedent that takes a contrary position. Thus, to the extent that certain nonbinding decisions of the Claims Court might be construed to suggest that a liquidated damages clause may only be challenged at the time of contract formation, this court declines to follow that reasoning.

Returning to plaintiff's motion, the court first addresses plaintiff's assertion that the liquidated damages rate is arbitrary. Specifically, plaintiff complains that one of the components of the liquidated damages rate described in Ms. Broussard's liquidated damages memorandum–"Construction Inspector Time"–lacks a rational basis. To support its view, plaintiff compares the amount Ms. Broussard assigned for this component to

the amounts appearing in the memoranda supporting the liquidated damages rates set forth in the Port Huron, Elizabeth City, and Elizabeth City reprocurement contracts. In the St. Petersburg and Port Huron memoranda, the assigned monthly cost was $10,000, while the assigned monthly cost in the Elizabeth City memorandum was $8,444 and the assigned monthly cost in the Elizabeth City reprocurement memorandum was $5,000. Pl.'s App. 237, 251, 253, 254(a). Plaintiff argues that it was unreasonable to assign three different amounts for the four projects.

Plaintiff's argument is unpersuasive. The court cannot determine whether the value of a particular component of a liquidated damages rate is proper, *e.g.*, whether "Construction Inspector Time" should be valued at $10,000, $8,444, or $5,000, based solely on the fact that different values were used for the component on different projects. It is plaintiff's burden to establish that the rate of liquidated damages is unreasonable. *DJ Mfg. Corp.*, 86 F.3d at 1134. Moreover, plaintiff must establish that the rate is unreasonable for the particular contract that imposes the rate. *Young Assocs., Inc.*, 471 F.2d at 622. Thus, if plaintiff's position is that a liquidated damages rate is unreasonable because a component of the rate is improper, it must prove that the component amount is improper as it relates to the particular contract at issue. In other words, it is plaintiff's burden to demonstrate that the Coast Guard could not have expected, at the time the parties executed the St. Petersburg contract, to spend $10,000 per month on inspection services if the project was delayed. Merely asserting that $10,000

**21.** A similar situation is found in another decision relied upon by defendant, *Mega Construction Co. v. United States*, 29 Fed.Cl. 396 (1993). In that case, the Court of Federal Claims provided that it was required to determine the reasonableness of liquidated damages "at the time the contract was executed rather than when the contract was breached or at some other subsequent time." *Id.* at 502. In support of this principle, the court cited *P & D Contractors, Inc.* , discussed above, and *United States v. Le Roy Dyal Co.*, 186 F.2d 460, 462 (3d Cir.1951), which cites *Priebe & Sons, Inc.* for the proposition that "the [liquidated damages] provisions are to be judged as of the time of making the contract." Thus,

the court's statement and reasoning in *Mega Construction Co.* can also be traced back to *Priebe & Sons, Inc.* Moreover, the court's subsequent analysis of the contractor's challenge of the liquidated damages clause reveals that it was not concerned with the timeliness of the challenge, but with the conditions that existed at the time the parties executed the contract. *See Mega Constr. Co.*, 29 Fed.Cl. at 502 (holding that the contractor "did not demonstrate that the assessment of liquidated damages was unwarranted, contrary to law, or unreasonable in the light of the circumstances existing at the time the parties entered into the contract").

per month is unreasonable because the Coast Guard used different amounts for different projects does not suffice.[22] Accordingly, as a matter of law, the court must reject plaintiff s suggestions of arbitrariness.

Plaintiff next challenges Ms. Broussard's inclusion of administrative costs as a component of the liquidated damages rate. As described above, the challenged administrative costs are the costs for the time of the Coast Guard officials involved in the contract's administration and performance. Plaintiff contends that because these officials would have received their pay and benefits regardless of the status of the contract, their pay and benefits could not be recovered as damages in the event of a breach, and therefore could not be a component of the liquidated damages rate. Defendant responds that the Coast Guard properly included these costs as probable damages, explaining that if the contractor breached the contract, the specified Coast Guard officials would be required to spend more time and resources on the project than they originally anticipated. This, in turn, would divert them from their work on other projects, which could ultimately result in the need to hire additional personnel.

■ The administrative costs about which plaintiff complains are a type of overhead. *See C.B.C. Enters., Inc. v. United States*, 978 F.2d 669, 672 (Fed.Cir.1992) ("Home office overhead includes the cost of such items as weekly payrolls [and] salaries ...."); *see also* FAR 31.105(d)(3) ("Costs incurred at the job site incident to performing the work, such as the cost of superinten-

dence, timekeeping and clerical work, engineering ..., etc., are allowable as direct or indirect costs...."); FAR 31.205–6(a) ("Compensation for personal services is allowable...."). There is no question that, as a general rule, a contractor can recover extended overhead as damages for government-caused delay. *See, e.g., Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1581 (Fed.Cir.1993) ("[A] government contractor may recover extended home office overhead during periods of government-caused delay."); *George Sollitt Constr. Co. v. United States*, 64 Fed.Cl. 229, 242 (2005) ("Extended field office overhead also may sometimes be recovered as delay damages."). Thus, to the extent that a contractor can demonstrate that it incurred personnel costs as a result of the government's delay, it is entitled to recover them as delay damages. See *Cornell Wrecking Co. v. United States*, 184 Ct.Cl. 289, 297–98 (1968) (per curiam) (allowing a contractor to recover the costs of the extra work done by a supervisor that resulted from the government's delay); *Luria Bros. & Co. v. United States*, 369 F.2d 701, 704–05 (Ct.Cl.1966) (allowing a contractor to recover "field supervision" costs resulting from the government's delay); *Wilner v. United States*, 23 Cl.Ct. 241, 258–60 (1991) (allowing a contractor to recover field labor costs, i.e., costs for the "extra hours worked by plaintiff's superintendent," as well as extended home office overhead, i.e., the contractor's salary, resulting from the government's delay). If a contractor can recover personnel costs as damages for delay, there is no reason to deny the government the same right.[23]

---

**22.** Moreover, plaintiff offers no explanation why a difference in the amount assigned for "Construction Inspector Time" for each project, in and of itself, is arbitrary. Merely because the assigned amounts are different for the various projects does not prove that the contracting officer lacked a rational reason for the difference. Indeed, the differences in the assigned amounts for the separate projects may be attributable to any number of reasons, including the scope, complexity, and location of each project, just to name three possibilities.

**23.** In the course of advancing another argument, plaintiff appears to contend that because the Coast Guard was not prevented from pursuing work on other contracts and did not need to hire

additional personnel due to the delayed completion of the St. Petersburg project, the Coast Guard is not entitled to recover personnel costs as damages. In concurring with the judgment of the majority in *Capital Electric Co. v. United States*, Judge Friedman of the Federal Circuit explicitly rejected such an argument:

[The government] argues that since the delay in performance ordinarily does not increase the total amount of office overhead the contractor incurs in connection with the particular contract, but merely spreads it over a longer period, allowing the contractor to recover for such overhead for the period of delay would result in compensating the contractor for losses it did not actually incur. According to the government, the only situations in which

Nevertheless, plaintiff objects that the personnel costs included in the liquidated damages rate would remain unaffected by any delay it caused, and therefore there is no increase in overhead that could be attributable to such delay. The court is not persuaded. The identified Coast Guard officials would be required to perform additional work if plaintiff caused a delay. This extra work has value that the Coast Guard is entitled to recover, and the pay and benefits of the officials charged with performing the additional work is a reasonable forecast of that value.

■ Moreover, there is no question that the Coast Guard is entitled to include administrative costs as a component of liquidated damages. *Jennie-O Foods, Inc.*, 580 F.2d at 413 ("Administrative expenses ... may also be considered and they may be particularly difficult of accurate estimation."); *Young Assocs., Inc.*, 471 F.2d at 621 (agreeing with the proposition that administrative expenses can be considered in calculating a liquidated damages rate); *Cegers*, 7 Cl.Ct. at 619 ("Potential administrative expenses ... may also be considered."). In fact, these allowable administrative costs include the precise type of costs to which plaintiff objects. *See Hogan Mech., Inc.*, ASBCA No. 21612, 78-1 BCA ¶ 13,164 (holding that personnel costs for engineers, contracting officials, lawyers, and clerical staff who were all "permanent employees" of the contracting agency and "would be used and paid regardless of whether [the contractor] completed its contract on time or late" were "properly the subject of a liquidated damages computation"). Accordingly, as a matter of law, the court rejects plaintiff's attempt to exclude the identified administrative costs from the Coast Guard's liquidated damages calculation.

Even if the administrative costs are properly included in the liquidated damages rate, argues plaintiff, the costs used by Ms. Broussard are flawed, and therefore do not reflect a reasonable forecast of the Coast Guard's damages. The first flaw plaintiff identifies concerns the percentages used by Ms. Broussard to calculate the amount of Coast Guard personnel resources attributable to the St. Petersburg project. Plaintiff contends that because Ms. Broussard did not know how the percentages had been derived originally, the percentages are unsupported and therefore unreasonable. The second flaw, according to plaintiff, is that Ms. Broussard based the administrative costs on a Coast Guard instruction that is not to be used as the basis for calculating liquidated damages rates. Plaintiff asserts that the express language of the instruction itself prohibits such a use. *See* COMDTINST 7310.1F at 2 (noting that the described standard rates "should not be used to calculate ... foreseeable costs related to contracting actions"). The third flaw noted by plaintiff is that even if Ms. Broussard was entitled to use the rates in the Coast Guard instruction, she used the rates for services provided to nongovernmental entities rather than the rate applicable to services provided to the government.

■ None of these purported flaws can provide the basis for challenging the liquidated damages rate set forth in the contract. The Federal Circuit has explained that so long as a liquidated damages rate is reasonable, a court should not "inquire into the process that the contracting officer followed in arriving at the liquidated damages figure that was put forth in the solicitation and agreed to in the contract." *DJ Mfg. Corp.*, 86 F.3d at 1137. It necessarily follows that, to the extent that a particular component of a liquidated damages rate can be challenged, so long as the component amount is reasonable, the court should not examine how that amount was determined. In other words, there is no legal basis for the court to reject Ms. Broussard's use of particular percentages, reliance on a particular Coast Guard

---

a contractor may recover for such extended office overhead is where the delay in performance: (1) requires the contractor to hire additional personnel or incur other additional expenses; or (2) prevents the contractor from taking on other work it would have been able to assume had there not been the delay.

Although superficially plausible, the government's argument does not withstand more penetrating analysis based upon the theory on which extended office overhead is allowed as an element of delay damages.
729 F.2d 743, 747–48 (Fed.Cir.1984) (Friedman, J., concurring).

instruction, or use of particular rates from that instruction. And, plaintiff has provided no evidence that the monthly costs assigned by Ms. Broussard—$583 each for the Construction Division and Contracting Division chiefs, $478 for the team leader, $2,755 for the project manager, and $957 for the contracting officer—were unreasonable without regard to how those amounts were derived. All that plaintiff has contended is that Ms. Broussard improperly determined these costs. As a matter of law, such a contention is insufficient.

Overall, plaintiff's legal arguments cannot support a challenge to the liquidated damages rate set forth in its contract with the Coast Guard. As a result, plaintiff has failed to establish that the liquidated damages rate of $564 per day is an unreasonable forecast of the damages that the Coast Guard would sustain in the event of plaintiff's breach. The contracted-for liquidated damages clause is therefore enforceable. Thus, the court must address plaintiff's second contention—that it is entitled to the remission of liquidated damages assessed by the Coast Guard for sixty-seven days of delay, as follows: thirty-two days for the delayed postaward kickoff meeting, eleven days for the delay related to the redesign of the building's foundation, and twenty-four days for hurricane-related delays.

### 2. The Postaward Kickoff Meeting and the Foundation Redesign

■ Plaintiff first claims that it is entitled to the remission of liquidated damages for thirty-two days of excusable delay related to the postaward kickoff meeting, contending that the Coast Guard was responsible for postponing the meeting beyond the time allowed by the contract. Plaintiff also claims that it is entitled to the remission of liquidated damages for eleven days of excusable delay related to the changes it made to the design of the building's foundation to incorporate footers for a future mezzanine, arguing that the changes were unnecessary because the Coast Guard did not award the contract option that included the mezzanine. However, as alluded to above, the court lacks jurisdiction to entertain these contentions.

To recover the liquidated damages retained by the Coast Guard, plaintiff was required to submit a claim to Ms. Broussard that provided her with adequate notice of the basis of its claim. The court has concluded that plaintiff provided Ms. Broussard with adequate notice of its claim for the remission of liquidated damages via its July 28, 2005 claim letter and its prior formal requests for time extensions. In none of those letters, however, did plaintiff seek to extend the contract completion date due to delays related to the postaward kickoff meeting or the changes it made to the design of the building's foundation.

The only correspondence in the record from the time of contract performance that relates to the postaward kickoff meeting is a brief series of electronic-mail messages in which plaintiff sought confirmation that the meeting had been canceled, inquired about a new date for the meeting, requested a limited notice to proceed with the building's design, and received notification of the new date for the meeting. Nowhere in these messages does plaintiff suggest that the Coast Guard's delay in convening the meeting delayed contract performance such that a time extension was required. Thus, even if the court were to consider these messages as part of plaintiff's claim for the remission of liquidated damages, their contents would not have apprised Ms. Broussard, when she was considering plaintiff's July 28, 2005 claim letter, that plaintiff believed that there was an excusable delay related to the postaward kickoff meeting.

Similarly, the correspondence in the record related to the changes plaintiff made to the foundation design could not have provided Ms. Broussard with notice that it was plaintiff's view that there was an excusable delay for the time it took to complete the new design. In a series of electronic-mail messages it sent to the Coast Guard on January 15, 2004, plaintiff indicated that it had to redesign the building's foundation to accommodate a future mezzanine and that it would not charge the Coast Guard for the cost of the redesign. Nowhere in these messages, or in any other correspondence during contract performance, does plaintiff suggest that

the time necessary to redesign the foundation should have resulted in an extension of the contract completion date. Thus, even if the court were to consider plaintiff's January 15, 2004 messages as part of its claim for the remission of liquidated damages, they lack sufficient information to form the basis of the claim.

The undisputed facts reflect that plaintiff did not submit a claim to Ms. Broussard that provided her adequate notice that it sought the remission of liquidated damages based on the alleged delays associated with the postaward kickoff meeting and the redesign of the building's foundation. Therefore, the court lacks jurisdiction to entertain these contentions.

### 3. The Hurricanes

■ Plaintiff's final contention in its motion for partial summary judgment is that it is entitled to the remission of liquidated damages to compensate for twenty-four days of delay attributable to Hurricanes Charley, Frances, Ivan, and Jeanne. In particular, it argues that although the Coast Guard extended the contract for thirty-one days for the days it could not work due to severe weather, the Coast Guard declined to grant extensions for the time it took plaintiff to demobilize before the hurricanes, remobilize after the hurricanes, and repair the damage caused by the hurricanes.

Unlike with the postaward kickoff meeting and the foundation redesign, plaintiff formally requested time extensions due to hurricane impacts. On August 16, 2004, it requested a two-day extension for time lost due to Hurricane Charley. And on September 9, 2004, it requested a thirty-seven-day extension for time lost due to Hurricanes Frances and Ivan. However, these two requests were resolved with contract modifications dated August 18, 2004, and September 21, 2004, which extended the contract completion date by fifteen days and sixteen days, respectively.

■ More importantly, each of the modifications contained a release absolving the Coast Guard from any further liability attributable to the three hurricanes. Specifically, each of the modifications contained the following language:

In consideration of the modification agreed to herein as complete and equitable adjustment for the contractor's proposal for adjustment, the contractor hereby releases the Government from any and all liability under the contract for further equitable adjustments attributable to such facts [or] circumstances giving rise to the proposal for adjustment, including all claims for impacts, delays and disruptions.

Pl.'s App. 231, 233. "As a general rule, the execution by a contractor of a release which is complete on its face reflects the contractor's unqualified acceptance and agreement with its terms and is binding on both parties." *Clark Mech. Contractors, Inc. v. United States,* 5 Cl.Ct. 84, 86 (1984); *see also C & H Commercial Contractors, Inc. v. United States,* 35 Fed.Cl. 246, 252 (1996) ("[O]rdinarily an executed bilateral contract modification that contains no reservations constitutes an accord and satisfaction of a claim."). Releases are interpreted like any other contract provision. *Bell BCI Co. v. United States,* 570 F.3d 1337, 1341 (Fed.Cir. 2009). Thus, if the language of the release is unambiguous, "it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions." *TEG–Paradigm Envtl., Inc. v. United States,* 465 F.3d 1329, 1338 (Fed.Cir. 2006). The releases here are unambiguous; they expressly prevent plaintiff from pursuing "further equitable adjustments" that are "attributable" to the "facts [or] circumstances giving rise" to the respective contract modifications. Because one contract modification compensated plaintiff for the impact of Hurricane Charley and the other contract modification compensated plaintiff for the impact of Hurricanes Frances and Ivan, plaintiff may not seek further relief related to these three hurricanes.

Plaintiff seeks to avoid the preclusive effect of the releases by arguing that the Coast Guard agreed that it could submit a claim seeking compensation for its hurricane-related demobilization and mobilization efforts. Plaintiff relies on Ms. Broussard's suggestion in a September 22, 2004 electronic-mail message–a message that postdates both contract

modifications–that plaintiff "submit a claim for the remaining days/monies [it] feel[s] are due." Pl.'s App. 305. However, Ms. Broussard's statement is irrelevant for two reasons. First, because the language of the releases is unambiguous, extrinsic evidence like Ms. Broussard's statement cannot be considered. Second, even if the language of the releases was ambiguous, Ms. Broussard's statement postdates both contract modifications, making it of little value in interpreting the intent of the parties in negotiating and executing the modifications.

 Moreover, if plaintiff believed that the Coast Guard's offers to extend the contract completion date did not sufficiently compensate it for all of its damages, then it was incumbent on it to ensure that its right to pursue a claim for additional compensation was adequately preserved in the release. As the court explained in *C & H Commercial Contractors, Inc.*, "any reservation of a right or a claim for damages from a bilateral contract modification must ordinarily be manifestly and explicitly set forth in the contract modification which incorporates the parties' settlement." 35 Fed.Cl. at 252; *see also Inland Empire Builders, Inc. v. United States*, 424 F.2d 1370, 1376 (Ct.Cl.1970) (per curiam) (noting that when a contractor "has, but fails to exercise, the right to reserve claims from the operation of … a release," the contractor may not, "absent some vitiating circumstance," maintain a suit that was based on the same events that led to the execution of the release). The releases included in the contract modifications did not contain any reservations.

It also bears noting that the otherwise unambiguous releases in this case could be rendered ineffective if the contract modifications were executed as a result of mutual mistake, if the Coast Guard induced plaintiff's agreement to the contract modifications through fraud, duress, or misrepresentation, or if plaintiff pursued its hurricane-impact claims after Ms. Broussard suggested it was possible. *See J.G. Watts Constr. Co. v. United States*, 161 Ct.Cl. 801, 806–07 (1963) (per curiam); *see also C & H Commercial Contractors, Inc.*, 35 Fed.Cl. at 254–57 (concluding that the government's assurances,

prior to the execution of bilateral contract modifications, that the releases would not preclude future claims were misrepresentations, rendering the releases ineffective). However, plaintiff does not make, and the record does not support, such allegations.

In addition to being precluded from pursuing further relief related to Hurricanes Charley, Frances, and Ivan, plaintiff is precluded from seeking the remission of liquidated damages related to the impact of Hurricane Jeanne. Plaintiff never formally requested from the Coast Guard an extension of the contract completion date for delays caused by Hurricane Jeanne. And, there is no other correspondence in the record in which plaintiff advises the Coast Guard that it required additional time to complete contract performance due to the impact of Hurricane Jeanne. Thus, it would have been impossible for Ms. Broussard, upon receipt of plaintiff's July 28, 2005 claim letter, to have been apprised that plaintiff sought the remission of liquidated damages for delays related to Hurricane Jeanne. The July 28, 2005 claim letter is therefore not a valid claim with respect plaintiff's allegations concerning that hurricane.

In sum, the undisputed facts demonstrate that plaintiff is precluded from pursuing further relief related to Hurricanes Charley, Frances, and Ivan due to the release contained in the relevant contract modifications, and that the court lacks jurisdiction to consider plaintiff's claim for the remission of liquidated damages to the extent it is based on delays allegedly caused by Hurricane Jeanne.

### 4. The Sequence of Construction

Having disposed of the contentions in plaintiff's motion for partial summary judgment, the court turns to the additional issues raised by defendant in its cross-motion for summary judgment. In its motion, defendant argues that plaintiff cannot establish that it should be credited with any excusable delay related to the sequence of construction. Defendant also argues that if it prevails on both this issue and the issues raised in plaintiff's motion, plaintiff's claim for the remission of liquidated damages is no longer via-

ble.[24] The court addresses each of these contentions.

### a. Excusable Delay

 Plaintiff originally sought an extension of time related to the sequence of construction in its July 1 and July 26, 2004 contract modification requests.[25] Subsequently, an expert retained by plaintiff for this litigation, Eric Unger, agreed that plaintiff was entitled to a time extension. Pl.'s App. 410. Specifically, Mr. Unger explained that in an attempt to meet the original contract completion date, plaintiff planned to erect the building before pouring the concrete slab. *Id.* at 411–12. However, that plan was rejected by the Coast Guard because a note on one of the drawings indicated that the slab would be poured before the building was erected. *Id.* at 412. Mr. Unger opined that the Coast Guard's rejection of plaintiff's plan prevented plaintiff from performing any work on the building until the slab was poured, constituted interference with plaintiff's means and methods of performing the work, and resulted in a forty-three-day excusable delay. *Id.* Defendant disputes the existence of an excusable delay on three grounds.

Defendant first contends that plaintiff never devised a schedule reflecting that it planned to pour the slab after it erected the building. Plaintiff responds that there is sufficient evidence in the record indicating that it had repeatedly informed the Coast Guard of its desire to erect the building before pouring the slab. Indeed, plaintiff's plan was discussed and rejected during the June 15, 2004 progress meeting, and plaintiff decried the Coast Guard's refusal to allow it to alter the construction sequence in its July 1 and July 26, 2004 letters. Thus, the evidence suggests that while plaintiff may not have formally submitted a revised construction schedule to the Coast Guard, it had certainly devised a new schedule and presented that schedule to the Coast Guard.

Defendant next argues that a deviation in the construction sequence required the approval of the contracting officer, which plaintiff never requested. It cites two provisions from the contract specifications in support of its position. The first of these provisions describes the procedures for making schedule revisions:

> A revised performance schedule shall be prepared when changes in the approved logic, duration, work schedule, design or contract performance time in response to significant deviations from the approved schedule baseline occur. The revised network schedule shall not be utilized for schedule updates until approved by the Government. If a proposed revision is disapproved by the Government, the previously approved network schedule shall continue to be used for monthly updates.

*Id.* at 201–02; *see also id.* at 197 (noting that a schedule update provides "actual start, current percent complete, and actual finish field updates to the complete performance schedule"). The other provision addresses changes in the contractor's means and methods:

> If changes in the method of operating and scheduling are desired, the Contracting Of-

---

**24.** In its motion to dismiss, defendant suggests that it sought summary judgment on plaintiff's claim for a $34,300 contract price increase. Defendant is mistaken. Indeed, defendant expressly limited its motion for summary judgment to plaintiff's claims for excusable delay. *See, e.g.,* Def.'s Mot. 3 ("Because K–Con cannot show that it is entitled to an extension for the 67 days claimed, nor for the remaining 23 days assessed, the Government cross moves for summary judgment and respectfully asks this Court to dismiss *K–Con's claims seeking remission of all 90 days of liquidated damages.*" (emphasis added)), 8 ("Accordingly, the Government moves not only for partial summary judgment concerning the 67 days claimed by K–Con, but also for the 23 days not addressed by K–Con in its motion."), 10 ("Lastly, summary judgment should be granted

to the Government for all of K–Con's claims because K–Con can set forth no facts to support a finding that it is entitled to *any extensions of the contract* encompassing the remaining 23 days of assessed liquidated damages not sought in its partial motion for summary judgment." (emphasis added)), 36 ("The Government's cross motion for summary [judgment] should be granted and K–Con's motion for partial summary [judgment] should be denied because K–Con cannot prove that ... the Government caused delay for any of the 90 days assessed by the Government.").

**25.** Accordingly, there is no jurisdictional issue regarding this aspect of plaintiff's claim for the remission of liquidated damages.

ficer shall be notified in writing stating the reasons for the change. If the Contracting Officer considers these changes to be of a significant nature, the contractor may be required to revise and submit for approval, without additional cost to the Government, the network charts and required sorts.

*Id.* at 202. Plaintiff, on the other hand, argues that the contracting officer's approval was not necessary because it was not proposing a variation from the requirements of the contract specifications, but rather an insignificant change to its drawings. Like defendant, plaintiff relies upon the means and methods provision. It also relies upon a provision regarding revisions to design drawings, which provides: "Revisions to design drawings, having been approved in writing by the Contracting Officer, must be logged into the drawing revision block and must clearly indicate the specific scope and location of the revision. Drawing revisions shall be accomplished manually on the approved original tracings." *Id.* at 179.

Plaintiff's position cannot be sustained. As an initial matter, the evidence in the record reflects that plaintiff desired to alter its construction schedule; instead of erecting the building after pouring the slab as set forth in the schedule it had submitted to the Coast Guard, it wanted to erect the building before pouring the slab. An amendment to the relevant drawing was merely a consequence of, and not a precursor to, plaintiff's desired schedule change. Thus, the provision regarding revisions to design drawings cited by plaintiff is not controlling.

The controlling provision describes the procedures for making schedule revisions and indicates that a revised schedule should "be prepared when changes in the approved ... work schedule [or] design ... in response to significant deviations from the approved schedule baseline occur" and could not be "utilized for schedule updates until approved by the Government." *Id.* at 201. The evidence in the record supports the view that changing the timing of the slab pour was a significant deviation from plaintiff's previ-

ously approved construction schedule: the Coast Guard concluded that the building could not be erected without the slab in place and it therefore consistently refused to allow plaintiff to alter its schedule, the contracting officer believed that the request required the prior approval of plaintiff's designer, and plaintiff characterized its change in the sequence of work as nontraditional. Thus, to alter the sequence of construction to ameliorate the delays it was encountering, plaintiff was required to prepare and submit a revised schedule. And, because plaintiff was not permitted to use an unapproved revised schedule for schedule updates, it follows that plaintiff could not begin performing work in accordance with the revised schedule until the Coast Guard approved it.

Moreover, to the extent that the provision concerning changes in the contractor's "method of operating and scheduling" is applicable to changes to the construction schedule itself,[26] there is no evidence in the record indicating that Ms. Broussard, at the time the Coast Guard was first notified of plaintiff's request to change its sequence of construction, considered plaintiff's request to be insignificant. As noted above, Ms. Broussard's July 28, 2004 letter to plaintiff, in which she stated that plaintiff's deviation from its drawings necessitated a revision or approval from the designer, suggests that she believed the request to be significant. Thus, under this provision, Ms. Broussard was entitled to require plaintiff to submit a revised schedule for approval.

Finally, even if plaintiff had complied with the procedures for obtaining the contracting officer's approval of its proposed change in construction sequence, its claim for excusable delay would still fail because there is no evidence that it submitted revised drawings to the contracting officer. Plaintiff's original drawings indicated that the building would be erected after the slab was poured. Thus, to effectuate the change in its construction sequence, plaintiff would have needed to revise the drawings. Then, contrary to its assertion, plaintiff was required to submit its

---

**26.** Based on a plain reading of the provision, the phrase "changes in the method of operating and scheduling" appears to relate to how the con-

tractor operated and scheduled the work, rather than to when or in what order it planned to accomplish the work.

revised drawings to Ms. Broussard for her approval. Accordingly, a necessary predicate to plaintiff's ability to alter the sequence of construction was the submission of revised drawings to Ms. Broussard.

In sum, the court concludes that plaintiff's failure to take the steps necessary to obtain the required contracting officer's approval to change its sequence of construction–the preparation and submission of a revised schedule and the submission of revised drawings–precludes plaintiff from recovering for an excusable delay on this issue. Plaintiff, not the Coast Guard, is to blame for its inability to erect the building before pouring the slab. Having reached this conclusion, the court need not address defendant's third and final argument against a finding of excusable delay–that Mr. Unger's delay calculation is based on the assumption that plaintiff would have begun erecting the building on June 15, 2004, even though the building was not delivered to the job site until July 14, 2004. Instead, it finds, in the absence of any genuine issue of material fact, that plaintiff is not entitled to the remission of liquidated damages for any delays incurred related to the sequence of construction.

### b. The Effect of the Court's Ruling

The court has determined that plaintiff has not established excusable delays related to the postaward kickoff meeting, the foundation redesign, the hurricanes, or the sequence of construction. As a result, defendant argues, plaintiff's entire claim for the remission of liquidated damages must fail. The court disagrees.

In its motion for partial summary judgment, plaintiff argues that it is entitled to the remission of liquidated damages due to sixty-seven days of excusable delay related to the postaward kickoff meeting, the foundation redesign, and the hurricanes. Plaintiff further asserts that it is entitled to the remission of liquidated damages based on other excusable delays, but that it is not seeking summary judgment on those issues due to the existence of disputed facts. In its motion for summary judgment, defendant acknowledges plaintiff's position that there are additional excusable delays that could support its claim for the remission of liquidated damages. Nevertheless, the underlying premise of defendant's motion is that the sixty-seven days of excusable delay alleged by plaintiff are not interchangeable with any other delay; in other words, once the court rules on those sixty-seven days, plaintiff is limited to claiming excusable delay for the balance of the ninety days for which the Coast Guard retained liquidated damages. Accordingly, defendant argues that it if the court grants it summary judgment with respect to both the sixty-seven days of excusable delay addressed in plaintiff's motion and the "remaining" twenty-three days of alleged excusable delay, it will have completely prevailed on plaintiff's claim for the remission of ninety days of liquidated damages.

Defendant's focus on the number of days for which the Coast Guard assessed and retained liquidated damages is misplaced. The court's conclusion that plaintiff cannot establish four distinct excusable delays with an aggregate duration of 110 days,[27] a duration well in excess of the number of days for which the Coast Guard assessed and retained liquidated damages, does not preclude plaintiff from attempting to establish the existence of other excusable delays. Rather, because delays can overlap, the focus should be on the delays themselves. So long as it remains possible for plaintiff to establish an excusable delay of at least one day in length, its claim for the remission of liquidated damages is viable.

Defendant assumes that plaintiff's claim for the remission of liquidated damages is based on Mr. Unger's expert report. In that report, as supplemented, Mr. Unger concludes that plaintiff is entitled to time extensions related to the postaward kickoff meeting (fourteen days), storm drain dewatering (one day), the sequence of construction (forty-three days), the hurricanes (ten days), and the foundation redesign (eleven days). He also concludes that plaintiff is not entitled to time extensions related to the submission of

---

**27.** These delays include thirty-two days related to the postaward kickoff meeting, eleven days related to the redesign of the building to accommodate a future mezzanine, twenty-four days related to the hurricanes, and forty-three days related to the construction sequence.

the 50% design, the water and sewer issues, and the cement shortage. Thus, to the extent that defendant's assumption is accurate, there remains at least one possible excusable delay that plaintiff can still pursue because neither party addressed it in their respective summary judgment motions–the storm drain dewatering delay. Further, it is unclear whether plaintiff's claim for the remission of liquidated damages is based solely on Mr. Unger's expert report. The durations of the time extensions that Mr. Unger identified as compensable in his report differ from the durations of the time extensions claimed by plaintiff in its motion for partial summary judgment. For example, even though Mr. Unger opines that plaintiff is entitled to a fourteen-day extension related to the postaward kickoff meeting, plaintiff sought a thirty-two-day credit for the delayed postaward kickoff meeting in its motion. Thus, the court is not prepared at this time to limit plaintiff's potential recovery to the precise delays identified in Mr. Unger's report.

In sum, because the parties have not fully addressed plaintiff's claim for the remission of liquidated damages, a grant of summary judgment on the entire claim would be premature.

### III. CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART** and **DENIES IN PART** defendant's motion to dismiss. It further **DENIES** plaintiff's motion for partial summary judgment and **GRANTS** defendant's cross-motion for summary judgment. Remaining viable are plaintiff's claim for the remission of liquidated damages for excusable delays not addressed in this Opinion and Order and plaintiff's claim for a $34,300 increase in the contract price.

The parties previously represented to the court that upon the court's resolution of the dispositive motions in this case, they would consider pursuing alternative dispute resolution with respect to this suit and the Elizabeth City and Port Huron suits. By **no later than Friday, December 28, 2012,** the parties shall file a joint status report indicating whether they still intend to pursue settlement in these cases.

**IT IS SO ORDERED.**